**Dated: August 3, 2022**

**The following is ORDERED:**



Janice D. Loyd
U.S. Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| David A. Stewart and Terry P. Stewart, | ) | Case No. 15-12215-JDL |
| | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| SE Property Holdings, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 16-1087-JDL |
| | ) | |
| David A. Stewart and Terry P. Stewart, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER UPON CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

**I.  Introduction**

After more than six years of acrimonious litigation, numerous depositions, more than two weeks of evidentiary hearings and tens of thousands of pages of document discovery, both Plaintiff, SE Property Holdings, LLC ("SEPH") and the Debtors have moved

for summary judgment.  SEPH seeks judgment on two of its five Counts objecting to the Debtors' discharge, those under 11 U.S.C. § 727(a)(2)(A)[1] (transferring, removing, destroying or concealing property of the debtor within one year before the date of the filing of the petition) and § 727(a)(4) (making a false oath or account).  The Debtors have moved for summary judgment on all five of SEPH's Counts objecting to the Debtors' discharge and one Count objecting to the dischargeability of a debt owed by Debtor David Stewart under § 523(a)(2)(A).

Before the Court on SEPH's motion for partial summary judgment on its claims are the following pleadings:

1. *Seph's Motion for Partial Summary Judgment* (the "Motion") [Doc. 127];

2. *Defendant Terry Stewart's Response to Plaintiff's Motion for Partial Summary Judgment* [Doc. 148];

3. *Defendant David A. Stewart's Response to Plaintiff's Motion for Partial Summary Judgment* [Doc. 149];

4. *SEPH's Reply to David A. Stewart's Response to SEPH's Motion for Partial Summary Judgment* [Doc. 156];

5. *SEPH's Amended Reply to Terry Stewart's Response to SEPH's Motion for Partial Summary Judgment* [Doc. 164];

6. *SEPH's Motion for Leave to Supplement the Summary Judgment Record* [Doc. 177];

7. *Defendant David A. Stewart's Supplement to Response to SEPH's Motion for Partial Summary Judgment* [Doc. 179]; and

8. *Defendant Terry Stewart's Supplement To Response To Plaintiff's Motion for Partial Summary Judgment* [Doc. 180].

---

[1] Unless otherwise indicated, all statutory references and citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101-1532.

Before the Court for decision on both of the Debtors' motions for summary judgment are the following:

1. *Defendant Terry P. Stewart's Motion for Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 129];

2. *Defendant David A. Stewart's Motion for Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 130];

3. *SEPH's Response to Defendant Terry P. Stewart's Motion for Summary Judgment* [Doc. 147];

4. *SEPH's Response to Defendant David A. Stewart's Motion for Summary Judgment* [Doc. 146];

5. *Defendant Terry Stewart's Reply To Response To Motion for Partial Summary Judgment* [Doc. 159];

6. *Defendant David A. Stewart's Reply To Plaintiff SE Property Holdings, LLC's Response To Motion for Summary Judgment* [Doc. 157]; and

Pursuant to the Federal Rules of Bankruptcy Procedure 7052,[2] the Court makes the following Findings of Fact and Conclusions of Law.

## II. Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), and 157(a) and the Order of Reference of the United States District Court for the Western District of Oklahoma as Local Rule LCvR 81.4(a). This matter seeking a determination of an objection to discharge and dischargeability of a debt are core proceedings under 28 U.S.C. § 157(b)(2)(I) and (J) over which this Court has authority to enter a final order. Venue is proper pursuant to 28 U.S.C. § 1409(a).

---

[2] All references to "Rule" or the "Rules" are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.").

## III. Findings of Fact

The determination of whether a motion for summary judgment is to be granted is based upon whether there are any material issues of fact which are undisputed and entitles the moving party to judgment as a matter of law. The Court finds the following material facts to be undisputed:[3]

## I. The Alleged Fraudulent Transfers and Concealment

### A. The "Oklamiss Transfer"

1. Debtors created Oklamiss Investments, LLC ("Oklamiss") on September 27, 1999. [Doc. 127-10, pg. 1]. [UMF 1].

2. From the formation of Oklamiss until the effective date of the purported Oklamiss Transfer, Debtors each owned 50% of the membership interests in Oklamiss. [Doc. 127-10, pg. 7]. [UMF 2]

---

[3] These Undisputed Facts are applicable to both SEPH's Motion on its two Counts under § 727(a)(2) and § 727(a)(4) and to the Debtors' motions for summary judgment which seek judgment for dismissal of all five of SEPH's Counts under § 727(a) and SEPH's Count under § 523(a)(2)(A) against Debtor David Stewart.

After the parties had submitted their summary judgment pleadings, the Court dismissed certain of SEPH's § 727(a)(2) and (4) claims insofar as they are based on the alleged violation of the Court's 2017 *Preliminary Injunction Order* and the disposition of the BP Claims Settlement Proceeds [Doc. 198]. The Court, with one noted exception, does not believe that such are "material" even if they are undisputed. Therefore, with the one noted exception discussed herein, the undisputed facts relative to the alleged violation of the *Preliminary Injunction Order* and the BP Claims are not included in this Opinion

The Undisputed Material Facts ("UMF") as stated by the Court are followed in brackets by the designation "UMF" followed by the numerical paragraph wherein such fact has been stated. Most of the UMF's make reference to the numerical paragraphs submitted by SEPH because the Debtors do not dispute the great majority of SEPH's UMF's. The Court has not included any fact (as distinguished from argument, characterization or conclusions) which the Debtors dispute. The Court has not included any fact which it does not consider material even if the parties did not dispute the same. The Court has edited the UMF's when necessary to remove all characterization, hyperbole, descriptive, argumentative and conclusory language and has in several instances added or deleted language from the both SEPH's asserted UMF's and/or Debtors' responses.

4

3. Amongst other assets, Oklamiss owns 99% of the membership interests in Raven Resources, LLC ("Raven Resources"), while Debtor David Stewart holds the remaining 1%. [Doc. 127-1, pg. 69; Doc. 127-2, pg. 160]. [UMF 3].

4. Debtors' ownership of Oklamiss contributed substantially to their net worth.  In the May 19, 2011 financial statement, Debtors reported that Oklamiss' real estate was worth more than $4.2 million. [Doc. 127-12, pg. 5].  The financial statement also reflected secured debt on those real estate assets of more than $5.5 million. [*Id*.].  Debtors further valued Raven Resources at $20 million. [*Id*. pg. 3].  In this financial statement, Debtors reported a total net worth of $19,358,491. [*Id*. pg. 1]. [UMF 4].

5. Debtors purported to transfer 98% of their interest in Oklamiss to their children, Thad Stewart, Neal Stewart and Jena Stewart Rush (collectively, the "Stewart Children"). [Doc. 127-11, pg. 1].  After this alleged transfer, the Stewart Children each held a 32.66% interest in Oklamiss, while Debtors each retained a 1% interest in Oklamiss. [*Id*.]. [UMF 5].[4]

6. Each of the Debtors, David Stewart and Terry Stewart, executed the transfer document. [*Id*.]. [UMF 6].

7. The Stewart Children did not pay any consideration for the transfer of the interests in Oklamiss. [Doc. 127-2, pg. 192; Doc. 127-7, pg. 22]. [UMF 7]

8. The face of the document reflecting the Oklamiss Transfer is dated October 31, 2011, with the effective date of January 1, 2012. [Doc. 127-11, pg. 1]. [UMF 8].

9. Debtors' December 31, 2012, financial statement shows that they owned a 100% membership interest in Oklamiss. [Doc. 127-13, pg. 2]. [UMF 9].

---

[4] David Stewart did not respond to the allegations contained in SEPH's UMF's 5-8.  Terry Stewart did respond and found the allegations to be undisputed.

10. The 2013 tax returns for Oklamiss continued to show that Debtors owned 100% of the interest in Oklamiss. [Doc. 127-14, pg. 12]. [UMF 10].

11. Raven Resources' former in-house counsel (Linda McGuire), former in-house accountant (Dan Neale), and former outside accountant (Dennis Lakely) testified that they did not learn of the Oklamiss Transfer until late 2013 or early 2014. [Doc. 127-4, pg. 255; Doc. 127-5, pgs. 85-86; Doc. 127-6, pg.118]. [UMF 11].[5]

12. Debtors' daughter, Jena Stewart Rush – a purported recipient of substantial interests – was not aware of the alleged Oklamiss Transfer until 2013. [Doc. 127-7, pgs. 21-22]. [UMF 12].

13. Though David Stewart contends that the Oklamiss Transfer was a gift, Debtors did not file a gift tax return. [Doc. 127-2, pgs. 192-193 & 198]. [UMF 13].

14. David Stewart maintained complete control over Oklamiss even after the alleged transfer. [Doc. 127-11, pg. 1 (purported transfer document stating that "David Stewart shall remain Managing Member (of Oklamiss) until he resigns or 12/31/2023, whichever occurs first."); Doc. 127-1, pg. 205]. [UMF 14].

15. The Stewart Children have received no distributions from Oklamiss and have paid no expenses associated with Oklamiss. [Doc. 127-5, pgs. 90-92]. [UMF 15].[6]

16. Debtors continued to receive all distributions from Oklamiss. [Doc. 127-14, pgs. 48 & 53; Doc. 127-5, pgs. 121-122]. [UMF 16].

---

[5] David Stewart did not respond to the allegations contained in SEPH's UMF's 11-13. Terry Stewart did respond and found the allegations to be undisputed. The Court has examined the source documents of SEPH's factual allegations in those paragraphs and finds them to be true.

[6] David Stewart did not respond to the allegations contained in SEPH's UMF's 15-17. Terry Stewart did respond and found the allegations to be undisputed. The Court has examined the source documents of SEPH's factual allegations in those paragraphs and found them to be true.

17. The Debtors and the Stewart Children signed documents agreeing that "all losses and profits attributable to Oklamiss... will be credited to (Debtors') ... tax return(s)." [Doc. 127-11, pgs. 3-6]. [UMF  17].

18. The Oklamiss Transfer was reflected in a decrease in the Debtors' net worth in their financial statements. Their May 19, 2011, financial statement showed a net worth of $19,358,491. [Doc. 127-12, pg. 1].  In the financial statement dated December 31, 2013, in which Debtors disclosed the Oklamiss Transfer, Debtors reported a net worth of $312,446. [Doc. 127-15, pg. 1]. [UMF 18].

19. Two loans from SEPH to David Stewart matured on December 3, 2009, and December 22, 2011. [Doc. 127-16, pgs. 4-5 & Exs. 1-2].  These two loans had an outstanding balance in excess of $3.7 million. [*Id.* pg. 7]. [UMF 19].

20. Debtors were guarantors on loans to Neverve, LLC ("Neverve") and ZLM Acquisitions, L.L.C. ("ZLM") with balances in excess of $26 million. [*Id*. pg. 7 & Exs. 3-9]. [UMF 20].

21. In 2012 and 2013, SEPH initiated multiple actions against Debtors and entities for which Debtors were guarantors, including *SE Property Holdings, LLC v. David A. Stewart, et al.*, Case No. 1:12-CV-00537-CB-M (S.D. Ala.) (filed on August 24, 2012) [Doc. 127-18]; *SE Property Holdings, LLC v. David A. Stewart,* Case No. 1:13-CV 00609-KD-C (S.D. Ala.) (filed on December 12, 2013) [Doc. 127-19]; and *SE Properties Holdings, LLC v. ZLM Acquisitions, L.L.C. et al.,* Case No. 1:13-cv-00610-CG-N (S.D. Ala.) (filed on December 13, 2013). [Doc. 127-20]. [UMF 21].[7]

---

[7] David Stewart did not respond to the allegations in SEPH's UMF's 21- 22.  Terry Stewart admitted that the allegations were undisputed. The Court can also take judicial notice of the docket

22. SEPH obtained summary judgment against Debtors in relation to the guarantees on the Neverve loans on May 19, 2014. [Doc. 127-17] . [UMF 22].

**B. The "NOG Transfer"**[8]

23. In the spring of 2014, David Stewart suggested to his mother, Ruth Carroll, that she form the Red Britt Irrevocable Trust ("Red Britt Trust") to hold Approximately $65,000.00 for unpaid royalties (the "Royalty Debt") purportedly due to her from Raven Resources. [Doc. 127-8, pgs. 27-28 & 114-115]. [UMF 23].

24. David Stewart suggested the creation of the Trust to outside counsel for Debtors and the entities they controlled. [Doc. 127-21, pg. 2 (email from David Stewart asking outside counsel "[h]ow much and how long would it take set up an irrevocable trust[?]")]; [Doc. 127-4, pgs. 175, 183, 215-217 & 222]. [UMF 24].

25. Ruth Carroll was not present for any of the discussions about creating the Red Britt Trust. [Doc. 127-4, pgs.164 & 180-181]. [UMF 25].

26. Ruth Carroll testified that she "didn't feel (she) was owed" the Royalty Debt. [Doc. 127-8, pgs. 114-115; Doc. 127-4, pg. 220]. [UMF 26].

27. When Ruth Carroll stopped receiving royalty checks in 2008, she did not inquire about the status of the royalties or attempt to collect any amounts due. [Doc. 127-8, pg. 33; Doc. 127-4, pgs. 178-179 & 347; Doc. 127-5,  pg. 262]. [UMF 27].

---

sheets of other state or federal district courts. *United States v. Ahidley*, 486 F.3d 1184, 1192 n. 5 (10th Cir. 2007); *Shoulders v. Dinwiddie*, 2006 WL 2792671(W.D. Okla. 2006)(court may take judicial notice of state court records available on the world wide web including docket sheets in district courts).

[8] Terry Stewart did not respond to the allegations of fact related to the NOG Transfer contained in UMF's 23-31 and 33-36 as she asserted they only related to the conduct of David Stewart. For reasons unknown, David Stewart did not respond to the facts alleged in SEPH's UMF's 21-25.

28. At the direction of David Stewart, Ruth Carroll executed documents creating the Red Britt Trust. [Doc. 127-8, pgs. 27-28; Doc. 127-24, pgs. 46-47]. [UMF31].

29. David Stewart is the primary beneficiary of the Red Britt Trust. [Doc. 127-24, pg. 10]. Debtors' daughter is the trustee, and Terry Stewart and the Stewart Children are secondary beneficiaries. [Doc. 127-24, pgs. 10-11]. [UMF 29].[9]

30. The Red Britt Trust has an effective date of March 19, 2014, but was not signed until July 23, 2014. [Doc. 127-24, pgs. 1, 10, 46 & 47]. [UMF 30].

31. Along with the Red Britt Trust paperwork, Ruth Carroll, at the direction of David Stewart and in-house counsel, assigned the Royalty Debt to the newly-created NOG, LLC ("NOG") in exchange for membership interests in NOG. [Doc. 127-25 , pg. 2; Doc. 127-26, pg. 1]. [UMF 31].

32. David Stewart then caused Raven Resources to transfer unencumbered interests in multiple oil and gas properties to NOG, allegedly to satisfy the Royalty Debt. [Docs. 127-26 & 27; Doc. 127-4, pgs. 106-107, 109, 234-235 & 237]. [UMF 32].

33. David Stewart executed assignments on behalf of Raven Resources to NOG on April 1, 2014; however, those assignments were not recorded with any County Clerk until late June and early July of 2014. [Doc. 127-27]. [UMF 33].

34. David Stewart selected the interests that were transferred from Raven Resources to NOG. [Doc. 127-4, pg. 245]. [UMF 34].[10]

35. The Walking Woman Well, one of the properties conveyed in the Raven

---

[9] David Stewart did not respond to SEPH's UMF 29. Terry Stewart did not dispute that she was a secondary beneficiary of the Trust as asserted in UMF 29.

[10] David Stewart did not respond to the facts stated in SEPH's UMF 34.

Resources/NOG Transfer, was a "good well" and the value of the assets conveyed from Raven Resources to NOG "went up considerably" when the Walking Woman Well came on line and started producing after the transfer. [Doc. 127-3, pgs. 59-60 & 70]. [UMF 35].

36. After the NOG Transfer, David Stewart, on behalf of NOG, executed an assignment of the ownership interests of NOG to be transferred to the Red Britt Trust. [Doc. 127-25, pg. 1; Doc. 127-4, pg. 214].[UMF 36].

37. David Stewart continued to act as manager for NOG after the NOG Transfer. [Doc. 127-28, pg. 8; Doc. 127-3, pgs. 33 & 35-36]. [UMF 37].[11]

38. While Jena Rush, the Debtors' daughter, was the trustee of the Red Britt Trust, David Stewart retained absolute control over the entities and assets within the Red Britt Trust.  Jena Rush testified that the only decision she made with respect to the assets of the Red Britt Trust was to direct her father to use trust funds to buy football tickets for the benefit of Jena and other members of the Stewart family. [Doc. 127-7, pgs. 58-59, 157, 170]. [UMF 38].

39. Jena Rush testified that she took no other actions to control and manage the assets of the Red Britt Trust, and she never reviewed any accounting or financial statements for the Red Britt Trust. [Doc. 127-7, pgs. 33, 35-36, 38, 42, 69 & 170]. [UMF 39].

40. David Stewart maintained absolute control over the entities conveyed to the Red Britt Trust. [Doc. 127-7, pgs. 34-35, 37, 92-93 & 171]. [UMF 40].

41. Raven Resources' in-house counsel conceded that the purpose of the Red Britt

---

[11] David Stewart did not respond to the facts stated in SEPH's UMF 37.

Trust was to "protect" the property "[f]rom creditor's" for the benefit of the Stewart Children. [Doc. 127-4, pgs. 184-185 & 193-194]. [UMF 41].

**II. The False Oaths**

42. SEPH filed the Involuntary Petition on September 30, 2014 (the "Petition Date"). [Doc. 127-30]. [UMF 42].[12]

43. Debtors filed their initial Schedules and Statements of Financial Affairs ("SOFA") on May 1, 2015. [Doc. 127-31; Doc. 127-32]. [UMF  43].

44. Debtors filed their Amended Schedules and SOFAs on September 29, 2015. [Doc. 127-33-36]. [UMF 44].

45. In their initial Schedules, Debtors disclosed that they owned a combined total of $5,500 in jewelry. During the Section 341 meeting of creditors, David Stewart testified that he owned a Rolex watch, which he valued at $500 in his initial Schedules and SOFA. Terry Stewart testified that she owned "a Rolex," "a wedding ring," "a band," a "little baby ring ... worth a couple hundred dollars," "a Tanzanite ring," and "a few [other] things." [Doc. 127-32 & 33; Doc. 127-38, pgs.40-42]. [UMF 45].

46. Documents from jeweler B.C. Clark show that Debtors purchased more jewelry than what they disclosed in their initial Schedules or their testimony at the Section 341 hearing. [*Compare* Doc. 127-39 with Doc. 127-38, pgs. 40-42; Doc. 127-31 & 32].  Terry Stewart testified all of the jewelry that she owned was disclosed, and that certain items on the B.C. Clark inventory list were purchased for other people, including a diamond engagement ring for Terry Stewart's now daughter-in-law [Doc. 127-9, pg. 315] and "Jelly

---

[12] David Stewart did not respond to the facts stated in SEPH's UMF's 42-46. In her separate response, Terry Stewart stated those facts to be undisputed.

11

Beans Quartz Strips, Michele Watches" for her daughter. [Doc. 127-9, pg. 309:19-24]. [UMF 46].

47. Debtors produced photographs of the jewelry purportedly in their possession. [Doc. 127-40]. Those photographs show that Debtors owned at least six necklaces, four watches, three pairs of earrings, three bracelets and six rings. [Doc. 127-40; see also Doc. 127-9, pgs. 292-296]. [UMF 47].

48. In his Amended Schedules, David Stewart disclosed that he owned $1,500 in jewelry, including the Rolex watch valued at $1,200. For the first time, David Stewart also disclosed in his Amended Schedules that he owned a Tag Heuer watch, which he valued at $250. [Doc. 127- 33]. [UMF 48].

49. In her Amended Schedules, Terry Stewart disclosed that she owned $7,012 in jewelry. [Doc. 127-35]. This valuation of Terry Stewart's jewelry was based on Kannard Jewelers placing a $449 appraised value on a Tanzanite ring that Debtors purchased for $7,475; [Doc. 127-9, pg. 305]; a value of $176 on earrings that Debtors purchased for $2,400 [Doc. 127-9, pg. 309]; a value of $7 on a bracelet that Debtors purchased for $265 [Doc. 127-9, pg 312-313]; a value of $150 on a cross and chain that Debtors purchased for $2,300 [Doc. 127-9, pg. 315]; and a value of $900 on diamond earrings that Debtors purchased for $6,250 [Doc. 127-9, pg. 316]. [UMF 49].

50. Debtors made these amendments to their Schedules after they learned that SEPH had issued the subpoena to B.C. Clark. [Doc. 127-42 (subpoena issued on August 31, 2015)]. [UMF 50].

51. Terry Stewart transferred a ring to her daughter, Jena Rush, as a wedding gift more than one year prior to her filing bankruptcy. According to the Debtors' homeowners

insurance policy the ring was valued at $36,600. [Doc. 127-9, pgs. 215-216; Doc. 127-7, pgs. 56-57; Doc. 127-43, pg. 43]. [UMF 51].

52. Debtors continued to insure the ring after the transfer to Jena Rush. [Doc. 127-43, pg. 43; Doc. 127-9, pg. 216]. [UMF 52].

53. More than one year prior to the date of bankruptcy, Terry Stewart gave Jena Rush a diamond tennis bracelet and a diamond necklace and gave her daughter-in-law a pair of earrings. [Doc. 127-9, pgs. 234-235, 297-298:21]. [UMF 53].

54. Raven Resources in-house counsel, Linda McGuire, testified that she told David Stewart that she thought Terry Stewart had undervalued her jewelry in her original Schedules, at which point Terry Stewart indicated that she had given some of the jewelry to Jena Rush. [Doc. 127-4, pgs. 115-116].  Linda McGuire specifically instructed Terry Stewart that she will "likely have to get (the jewelry) back" from Jena Rush. [*Id*. at 115]. [UMF 54].

55. A registration "renewal/transfer" of an Everglades boat referenced a renewal date of September 30, 2015, with the registered owner as the Debtors' son, Thad Stewart. After the transfer of the boat, an umbrella liability policy owned by the Debtors included coverage for a "powerboat" as a Rated Exposure. [Doc. 127-44, pgs. 2-3 (listing the Debtors' son, Thad Stewart, as a driver)]. [UMF 55].

56. The Debtors' initial Schedules and their testimony at the Section 341 meeting did not disclose ownership of an all-terrain vehicle ("ATV"). [Docs. 127-31, 32 & 38].  In subsequent testimony, David Stewart stated that a Polaris ATV had been assigned to NOG for no consideration to be used on one of NOG's oil and gas leases. [Doc. 127-2, pg. 69]. [UMF 56].

13

57. In the *Motion to Abandon* and at the hearing conducted thereon, David Stewart represented that the unencumbered assets of Raven Resources had no net value. In a later matter this Court found no equity in Oklamiss, the related entity which held almost all membership interests in Raven Resources. Subsequent to the hearings on the *Motion to Abandon*, David Stewart, on behalf related entities, caused to be sold approximately seven unencumbered and undeveloped interests for more than $3.9 million. [Doc. 127-29, pg. 34]. [UMF 57].

58. At his June 27, 2017, deposition, David Stewart testified as follows:

> Q. Have any of the entities with which you have ever had an interest received, to your knowledge, funds related to the BP claims other than Zeke's or ZLM?
>
> A. We received some BP claims on the houses on Ono and on the condo that were minimal fixed numbers back in '12, probably.
>
>            ****
>
> Q. Okay. Other than those, have any of the entities or you received any proceeds from BP claims?
>
> A. I have not.
>
>            ****
>
> Q. What about Neverve?
>
> A. I don't know about Neverve.
>
>            ****
>
> Q. Okay. To your knowledge, did Neverve make a BP claim?
>
> A. Neverve did make a BP claim.
>
> Q. Okay. And, again, just to be clear, to your knowledge, have any proceeds or payments or funds been paid on that BP claim by Neverve?

14

A.  I don't know.

[Doc. 127-46, pg. 617-619]. [UMF 58].[13]

## IV. Summary Judgment Standards

### A. Summary Judgment Standards in General

It is appropriate to grant a motion for summary judgment when the pleadings and other materials in the record, together with supporting affidavits, if any, demonstrate that there is no genuine dispute with respect to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c), made applicable to this adversary proceeding by Rule 7056; *In re Wormington*, 555 B.R. 794, 797 (Bankr. W.D. Okla. 2016). "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). Courts must review the evidentiary material submitted in support of the motion for summary judgment to ensure that the motion is supported by evidence. If the evidence submitted in support of the summary judgment motion does not meet the movant's burden, then summary judgment must be denied. Hearsay evidence cannot be

---

[13] This deposition testimony was admitted into evidence at the *Motion to Approve Compromise and Settlement* held before the Court on August 30, 2017. [BK 15-12215, Doc. 466-2, pgs. 109-112].

As will be discussed herein, the Court has previously held that any SEPH claim under § 727(a)(2) or (4), based upon the disposition of the BP Claims Settlement Proceeds was barred for not having been timely brought. [*See Order Granting in Part and Denying in Part Defendants' Motion to Dismiss or Strike Certain Allegations and Claims As Untimely*, Doc. 198]. David Stewart's testimony regarding the BP Claims Settlement Proceeds as an Undisputed Material Fact is viewed only for the purpose of evaluating his candor, credibility and veracity.

considered on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

When considering a motion for summary judgment, the court views the record in the light most favorable to the party opposing summary judgment. *See Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991) (the court "must view the record in a light most favorable to the parties opposing the motion for summary judgment."); *Harris v. Beneficial Oklahoma, Inc. (In re Harris*), 209 B.R. 990, 995 (10th Cir. BAP 1997).

Denial of summary judgment requires existence of genuine material issues that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986). No genuine issue of fact exists if a rational fact finder, when viewing the record as a whole, could not find for the party opposing the summary judgment. *See Matsushita Electric Industries Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) ("where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). "[T]he nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

## B.  Summary Judgment in Objections to Discharge

A "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and

16

discouragement of pre-existing debt.'"  *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654 (1991).  As the mantra of bankruptcy goes, a discharge of indebtedness in bankruptcy is reserved for the "honest but unfortunate debtor." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695 (1934).  In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor.  It is a well-established rule that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor. *Kawaauhua v. Geiger  (In re Geiger)*, 523 U.S. 57, 118 S.Ct. 974 (1998); *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305 (1995). *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997) (acknowledging generally "that the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor.").

Despite the policy of the "fresh start", "to be entitled to discharge, the debtor must deal fairly with creditors and with the Court." *Wieland v. Gordon (In re Gordon),* 526 B.R. 376, 387 (10th Cir. BAP 2015).  "The bankruptcy system is set up to protect 'honest but unfortunate debtors,' not those who would abuse it to further their own interests." *Id.* at 397. "[A] discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wieland v. Gordon (In re Gordon)*, 509 B.R. 359, 370 (Bankr N.D. Okla. 2014).

The burden of proof for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S.Ct. 654, (1991).  In order to obtain a denial of a discharge, plaintiff "must prove each statutory element by a

17

preponderance of the evidence." *In re Gordon*, 509 B.R. at 370. Once a plaintiff "establishes *a prima facie* case for denying defendant's discharge under § 727, the burden of going forward shifts to the Defendant." *Id.* "The various discharge exceptions of § 727(a) are independent, and a plaintiff need only prove the elements of one exception by a preponderance of the evidence in order to obtain a denial of discharge." *In re Gordon*, 526 B.R. at 394.

**C. Summary Judgment to Deny Discharge Where Showing**
**of Fraudulent Intent Required**

A debtor's discharge is rarely denied by summary judgment. Most grounds for denial of a discharge, including those presented in this case, require a finding that a debtor intended to mislead, conceal, or deceive. "As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment." *In re Herrman,* 355 B.R. 287, 291 (Bankr. D. Kan. 2006) (citing *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980), *cert. denied* 451 U.S. 984, 101 S.Ct. 2316 (1981)); *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Questions of intent involve many intangible factors, such as witness credibility, that are best left to the consideration of a fact finder after a full trial."). "But in an exceptional case, a person's 'denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it,' making a trial on the question of the person's state of mind unnecessary." *Herrman,* 355 B.R. at 291. Thus, while the issue of intent involving a person's state of mind is generally a question of fact that may preclude summary judgment, there is no *per se* rule that summary judgment is improper under § 727(a) where intent is an issue. Likewise, it is not *per se* inappropriate to grant summary judgment when intent is an

18

element of proof for a non-dischargeability determination under § 727(a).

Important to the issue of intent in this case, is that we are not dealing with what might be regarded as a "standard," "garden variety" motion for summary judgment. This Court has conducted many not-so "mini-trials"– evidentiary hearings – involving the same issues which are presented to this Court by the present Motion and, in part, the Debtors' motions for summary judgment. Early in this bankruptcy, in November 2015, the Debtors filed a motion to abandon certain person property [BK 15-12215, Doc. 214] by which they sought to have the Trustee abandon all membership interests in three limited liability companies, Raven Resources, Oklamiss and Shimmering Sands Development Company, LLC ("Shimmering Sands"), two of the same entities involved in the present Motion before the Court. The Debtors had conveyed their respective interests in Oklamiss to their three adult children by assignment in October 2011, nearly three years before the filing of the Involuntary Bankruptcy Petition by SEPH. David Stewart asserted that any interest he and his wife held were of such inconsequential value or burdensome to their bankruptcy estates they should be abandoned. In response, the Trustee and SEPH raised serious questions as to whether the transactions with Oklamiss, the Stewart Children and the Red Britt Trust constituted avoidable fraudulent transfers under §§ 544 and 548 involving most of the same facts, albeit on different theories of relief, as sought in the present proceeding. After conducting an evidentiary hearing on the Stewarts' motion to abandon which lasted four days, comprised 814 pages of transcript, the testimony of five witnesses, including the lenghty testimony of David Stewart, and allowed into evidence 67 exhibits, the Court denied the Debtors' motion to abandon in order to allow the Trustee and SEPH time to further investigate the questioned transactions.

19

In January 2016, the Trustee filed an adversary against the Debtors, the Stewart Children, David Stewart's mother, and non-debtors, Oklamiss, Raven Resources and NOG alleging fraudulent transfers under § 548 as well as under the Oklahoma Uniform Fraudulent Transfers Act.[14]   The facts in that adversary largely mirrored the facts in the present non-discharge, non-dischargeability adversary.   Substantial discovery was conducted in both that and this adversary.

 In 2017 the Trustee and the Debtors filed a *Second Joint Motion to Approve Compromise and Settlement Agreement* [BK-15-12215, Doc. 472] seeking to resolve all pending adversaries except the present non-discharge and non–dischargeability action. On the motion to compromise, the Court conducted 14 days of hearings, consuming more than 2,700 pages of trial transcript, hundreds of exhibits consisting of thousands of pages and heard the live testimony of seven witnesses (plus four by deposition).   A substantial part of the evidence involved the evaluation of the merits of the Trustee's fraudulent transfer claims which were based on the same facts presented by SEPH's present Motion. In the lengthy hearings on both the motion to abandon and the motion to compromise the Court heard the testimony of David Stewart, including that related to both the alleged fraudulent transfers under §§ 727(a)(2) and 548 and the accuracy of the bankruptcy Schedules, the very issues now presented to the Court by SEPH's Motion.

Between the hearings on the motion to abandon and the motion to compromise, David Stewart testified for almost five full days which comprised approximately 1,000

---

[14] Title 24 O.S. § 112 *et seq.; "Gould, Plaintiff v. David A. Stewart et. al, Defendants*," Adv. #16-01002-JDL.

pages of transcript.[15]  The Court was clearly able to assess his demeanor, veracity and credibility.  Thus, the Court's ability to make the necessary determination of David Stewart's intent and state of mind in the present Motion is not based solely on the normal summary judgment sterile environment of depositions, documents and pleadings.[16]  This Court has, in effect, already conducted a trial on the merits with regard to the issue of fraudulent transfers allegedly made by Debtors.  It is difficult to imagine what additional evidence, including evidence relating to David Stewart's intent, the parties could present.

## V. Discussion

### A. Preliminary Considerations.

Because of the "fresh start" policy underlying the Bankruptcy Code and the harshness of the penalty of denial of a debtor's discharge, the Court construes the discharge provisions under the Bankruptcy Code liberally in favor of the debtor and strictly against the party objecting to discharge.  See *Gullickson v. Brown (In re Brown)*, 108 F.3d

---

[15] December 10, 2015 [BK-15-12215, Doc. 243]; January 19-20, 2016 [BK-15-12215, Docs. 268 & 270]; August 28-30, 2017 [BK-15-12215, Docs. 466, 466-1 and 466-2].

[16] The thoroughness of the record before the Court is not only demonstrated by the thousands of pages of the record of seventeen (17) days of hearings conducted by the Court, but also by the volume of the record contained in the motions for partial summary judgment filed by SEPH and the Debtors' response thereto.  SEPH's Motion directed against each of the Debtors and its responses to the Debtors' cross-motions comprised 2,224 pages of pleadings and exhibits. [Docs. 127, 146, 147, 156 & 164]. The Debtors' responses to SEPH's Motion are comprised of 707 pages. [Docs. 148 & 149].  Document discovery produced by the Debtors in the lead bankruptcy case and this adversary has exceeded 40,000 pages.

It is important to note that the Court, with the concurrence of the parties, determined that the established factual record in previous hearings conducted in the lead bankruptcy case could be utilized insofar as it was relevant to the non-discharge, non-dischargeability issues in this adversary. In short, the Court determined it was not necessary "to re-invent the wheel" by reintroducing evidence in this adversary that had already been admitted in prior hearings. [Doc. 83, Transcript of Hearing on Scheduling conference, 6/25/20].

1290, 1292 (10th Cir. 1997) (acknowledging generally "that the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."); *Rosen v. Bezner*, 996 F.2d 1527, 1534 (3rd Cir. 1993) (noting that "§ 727 is to be construed liberally in favor of the debtor and that a total bar to discharge is an extreme penalty"); *Freelife International, LLC v. Butler (In re Butler)*, 377 B.R. 895, 915 (Bankr. D. Utah 2006) ("exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor").

## B. Denial of Discharge for Debtors' Transfer of Property under § 727(a)(2)[17]

SEPH asserts that the Debtors should be denied a discharge as result of Debtors' fraudulent transfer of assets in an attempt to hinder, delay, and defraud their creditors pursuant to 11 U.S.C. § 727(a)(2). In response to SEPH's Motion and in support of their motions for summary judgment, Debtors assert that: (1) the transfers of which SEPH complains were made outside of one year next preceding the filing of bankruptcy as required by § 727(a)(2); (2) the transfer of properties owned by limited liability companies in which the Debtors held membership interests did not constitute a transfer of "property of the estate" within the scope of § 727(a)(2) and (3) as to Terry Stewart, there has been no evidence produced to indicate that she participated in the transfer of the assets complained of by SEPH.

---

[17] As will be discussed below, the Court will be addressing two separate transfers designated as the "Oklamiss Transfer" and the "NOG Transfer." SEPH had also made claims that the transfer of the BP Settlement Proceeds which were paid to the Debtors' counsel also fell within its § 727(a)(2)(A) claims. By the Court's *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss or Strike Certain Allegations and Claims as Untimely* of March 14, 2022 [Doc. 198], the claims related to the BP Settlement Proceeds were dismissed as untimely brought. It will not be addressed herein.

Section 727(a)(2)(A) of the Bankruptcy Code, provides:

> (a) The court shall grant the debtor a discharge, unless –
>
> > (2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred... or concealed, or has permitted to be transferred ... or concealed –
> >
> > > (A) property of the debtor, within one year before the date of the filing of the petition ....

Under this section, a debtor is not entitled to receive a discharge if the debtor: (1) transfers property; (2) in which the debtor has an interest; (3) within one year of the petition date; (4) with the intent to hinder, delay, or defraud a creditor." *Brown*, 108 F.3d at 1293. To deny the Debtors a discharge under § 727(a)(2)(A) SEPH must establish by a preponderance of the evidence that Debtors violated this provision. *First National Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991) (standard of proof under 727(a)(2) is preponderance of the evidence, not clear and convincing evidence); *Gullickson v. Brown, (In re Brown),* 108 F.3d 1290, 1293 (10th Cir. 1997) ("In order for a debtor to be denied a discharge under § 727(a)(2)(A), the objector must show by a preponderance of the evidence...."). The Court must examine the evidence produced by SEPH as to each of the elements required for barring the discharge of the Debtors under § 727(a)(2)(A).[18]

---

[18] After the Trustee and SEPH raised the issue of the Oklamiss and NOG Transfers as constituting fraudulent transfers under § 548, the Debtors' "unwound" those series of transactions by reconveying all property transferred to NOG back to Raven Resources. That the Debtors may have taken action to, in effect, negate the transfers is without effect on the claims of SEPH that such transfers form the basis of an objection to discharge. Mere disclosure of a fraudulent bankruptcy transfer of property is not a defense to § 727(a)(2)(A) claim. Some courts have held that a debtor's discharge may be granted only if "he reveals the transfers to his creditors, [and] recovers substantially all of the property *before* he files his bankruptcy petition...." *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1345 (9th Cir. 1986). Other courts hold the discharge

### 1. The Transfer by the Debtors' of Property of the Estate

SEPH asserts that there were two separate prohibited transfers of property of the Debtors: the "Oklamiss Transfer" and the "NOG Transfer."  Under the Bankruptcy Code, "transfer" is broadly defined to include "every mode... of... parting with... an interest in property."  11 U.S.C. § 101(54).  As discussed in more detail below, a membership interest in a limited liability company constitutes the personal property of the member. The undisputed facts show that prior to the Oklamiss Transfer the Debtors held 100% of the membership interest in Oklamiss.  By the Oklamiss Transfer the Debtors transferred 98% of their membership interests in Oklamiss (which held 100% of the membership interest in Raven Resources) to the Stewart Children.  This was a straightforward transfer of property of the Debtors meeting the requirements of § 727(a)(2)(A).

Whether there was the requisite transfer of property of the Debtors in the case of the NOG Transfer is more problematic. SEPH asserts that "Debtors caused Raven Resources to assign its interest in oil and gas properties to NOG, caused the membership interest in NOG to be assigned to Ruth Carroll and then caused Ruth Carroll to assign her membership interest in NOG to the Red Britt Trust..."  This series of transfers had the effect of removing Raven Resources' interest in unencumbered assets to the Red Britt Trust." [Doc. 127, pg. 20; UMF's 31, 32, 34 & 35].

The Debtors concede they made the questioned transfers; however, they deny that the membership interests in the LLC's were "property of the debtor within one year before

---

may be denied under § 727(a)(2)(A) even if the debtor recovers fraudulently transferred property prior to filing for bankruptcy. *See, e.g.*, *Davis v. Davis (In re Davis),* 911 F.2d 560, 562 (11th Cir. 1990).  Under either approach, the Debtor's attempt to "undo" the transfers is irrelevant.

the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A).  As discussed below, there is an important distinction in the nature of the transfers between the Oklamiss Transfer and the NOG Transfer for determining whether such transfers meet the second element of § 727(a)(2)(A) that the transfer involves "property of the estate."

It is well established that defining "property of the [bankruptcy] estate" under § 541(a) is a question of federal law, but the nature and extent of the debtor's interest in property, is determined by applicable state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914 (1979); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002) ("For purposes of most bankruptcy proceedings, property interests are created and defined by state law.").  Therefore we must determine the nature of Debtors' interest in Oklamiss and NOG under Oklahoma law as of the time of the transfers.

The Oklahoma Limited Liability Company Act (the "LLC Act"), 18 O.S. § 2000 *et seq.*, governs the formation, operation, and dissolution of Oklahoma limited liability companies. *In re Midpoint Development, L.L.C.,* 466 F.3d 1201, 1204 (10th Cir. 2006); *In re Grooms,* 599 B.R. 155, 159 (*Bankr. W.D. Okla. 2019)*; *In re White*, 556 B.R. 489, 494 (Bankr. N.D. Okla. 2016); *Vista Exploration Co. v. Mewbourne Oil Co.*, 2010 WL 1980196 (W.D. Okla. 2010).  As a general rule, a limited liability company is a legal entity distinct from its members, and the assets and liabilities of the limited liability company are separate from the assets and liabilities of its members. 18 O.S. § 2032 ("A capital interest is personal property.  A member has no interest in specific limited liability company property.").  Rather than owning an interest in the assets of the limited liability company, a member holds a capital interest in the limited liability company. That capital (membership) interest is personal property and therefore "property of the debtor."  There

25

is no question that the transfer of the Debtors' membership interests in Oklamiss to their children constituted a transfer of "property of the debtor" sufficient to meet the second element of § 727(a)(2)(A). The more difficult question is whether the transfers of the membership interests to NOG were transfers of "property of the debtor."

As stated above, under Oklahoma law any membership interest of an LLC is considered personal property of the LLC member. In the NOG Transfer the membership interests transferred to NOG were not those held by the Debtors but by Raven Resources (whose member was Oklamiss) to Ruth Carroll who, in turn, assigned her interest to the Red Britt Trust which, in turn, assigned the membership interest to NOG. Although the transactions are admittedly convoluted, and likely intended to place properties beyond the reach of creditors, the important thing for determination of whether the membership interests were "property of the debtor" is that the Debtors, while retaining practical control of Oklamiss, Raven Resources, Ruth Carroll and the Red Britt Trust, either did not hold or transfer any membership interest in those entities at the time of the transfer of assets to NOG.

SEPH asserts that "prior to the Oklamiss Transfer, Debtors owned 100% of Raven Resources through David Stewart's individually-held interests and Debtors' interests in Oklamiss" and "as a result Debtors had 'an interest' in all the assets of Raven Resources, and the NOG Transfer involved nothing more than the transfer and depletion of those assets." [Doc. 127, pg. 21]. SEPH's characterization that the transfer of the LLC interest to NOG was a "transfer of property of the debtor" ignores the nature of the interest which was conveyed to NOG sufficient to satisfy the second element of § 727(a)(2)(A). As stated above, under the Oklahoma Uniform Limited Liability Act there is a complete separation

26

of a membership interest and the assets of an LLC.  The membership interest is personal property of the member, but assets of the LLC (here the oil and gas interests) are held and owned in the name of the LLC.  Thus, courts have held that property owned by an LLC is property of the company, not property of the members of the company.  *In re Bolon,* 538 B.R. 391, 398 (Bankr. S.D. Ohio 2015); *In re Breece,* 2013 WL 197399, at *3 (6th Cir. BAP 2013) ("A 'membership interest' in a limited liability company [under Ohio law]... does not confer upon the 'member' any specific interest in company property, whether personal property or real property.  Such property is, instead, held and [owned] solely by the Company."); *In re Liber*, 2012 WL 1835164, at *4 (Bankr. N.D. Ohio 2012).

In the NOG Transfer, Debtors caused Raven Resources to assign interests in oil and gas properties to NOG, caused the membership interest in NOG to be assigned to Ruth Carroll and caused Ruth Carroll to assign her membership interest in NOG to the Red Britt Trust.  No property owned by the Debtors, neither a membership interest in an LLC nor tangible assets, whether real or personal, owned by the Debtors was transferred to NOG.  The Court therefore finds that the Debtors transfer of the membership interests in Oklamiss were transfers of property of the debtor within the scope of § 727(a)(2)(A).  The Court further finds that the transfers of membership interests and or assets from other entities to NOG were not within the scope of said statute.

### 2. Transfer Within One Year Preceding the Filing of Bankruptcy

The time of the transfer(s) can be determined upon an objective determination based on the undisputed time-line facts.  The Oklamiss and NOG Transfers occurred at different times.  It is undisputed that the NOG Transfer by which property was conveyed from Raven Resources to the Red Britt Trust to NOG occurred in 2014, clearly within one

27

year preceding the filing of bankruptcy on September 30, 2014, as required by §
727(a)(2)(A). This finding, however, is rendered moot by virtue of the Court having
previously found that the NOG Transfer failed to meet the statutory requirement that there
being a transfer "of property of the debtor."

On the other hand, the Oklamiss Transfer was affected by a document executed on
October 31, 2011, effective January 1, 2012.  Either date was more than one year
preceding the filing of the Debtors' involuntary bankruptcy September 30, 2014.  SEPH
doesn't dispute that on the relevant documents on their face show that the Oklamiss
Transfer was outside the one year requirement of § 727(a)(2)(A).  SEPH argues, however,
that the Debtors' continuing concealment of the Oklamiss Transfer during the one year
preceding the bankruptcy brings the Oklamiss Transfer within an exception to the time
requirement of § 727(a)(2)(A).  Specifically, SEPH points out that this concealment is
evidenced by the Debtors continuing to represent to creditors, tax authorities (on returns
for years 2012 and 2013), employees and the recipients of the interests transferred that
they (the Debtors) still owned all of the membership interests in Oklamiss.  This, SEPH
contends, constitutes conduct falling within the so-called "continuing concealment"
exception to the one-year rule.  Debtors respond by asserting that David Stewart's
"evidence ... that the transaction took place on the date provided in the document creates
at least a genuine dispute as to material fact to survive summary judgment on this issue."
[Doc. 149, pg. 15].  The Court finds otherwise.

In this case, Debtors' asset transfer of their membership interest to their children
may have occurred more than one year prior to their bankruptcy.  However, "[u]nder the
'continuous concealment' doctrine, a concealment will be found to exist during the year

28

before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year." *In re Gordon*, 526 B.R. 376, 389 (10th Cir. BAP 2015) (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993). Thus:

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property. Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest – a secret interest of which retention of the benefits of ownership may be evidence.

*Id., See also United States v. Garland (In re Garland)*, 385 B.R. 280, 296 (Bankr. E.D. Okla. 2008) (The continuous concealment doctrine applies where there is "[e]vidence that a debtor transfers property but still retains a beneficial or equitable interest in the property and treats the property the same as before the transfer...."); *Newton v. Essres (In re Essres),* 139 B.R. 958, 961 (D. Colo. 1992) ("The continuing concealment doctrine allows a court to deny discharge if a debtor transfers property outside the one year limitation period if the transfer is concealed or beneficial interests are retained into the prescribed one year period."); *In re Fletcher*, 2015 WL 1239811, at *10 (Bankr. N.D. Okla. 2015) ("Courts have consistently found that the concealment of a secret beneficial interest in property that continues into the year before bankruptcy is within the reach of § 727(a)(2)(A).").

Here, it is undisputed that while the transfer document shows the Debtors transferred their membership interests in Oklamiss to their children in 2011 (effective

29

January 1, 2012) they continued to represent in a financial statement executed in June of 2013 that they still owned a 100% interest in Oklamiss; the Oklamiss 2013 tax return, prepared in 2014, showed the Debtors still owned a 100% of the interest in Oklamiss throughout 2013; in October 2013 and July 2014 the debtors' children, within one year of the bankruptcy, the recipients of the Oklamiss Transfer, signed profit and loss allocation directives permitting the Debtors to claim the profit and loss allocations of Oklamiss on their tax returns; Raven Resources employees and contractors testified that they were not aware of the Oklamiss Transfer until late 2013 early 2014. [UMF's 8, 9, 10, 11, 12, 14, 15, 16 & 17].   In short, Debtors retained their beneficial interest and were still publicly representing that they owned all interests in Oklamiss into 2014 – well within a year before the bankruptcy filing.

The Court therefore finds that the Oklamiss Transfer by which the Debtors assigned their membership interest in Oklamiss to the Stewart Children is determined to be within the purview of § 727(a)(2) (A) notwithstanding the fact that such assignments themselves purportedly occurred more than one year prior to the filing of bankruptcy.

### 3. Transfer Made with Fraudulent Intent

As to the required element of actual fraudulent intent required to deny a discharge, the fact-finder, here the Court, must be persuaded, either by direct evidence or by the inference from the facts and circumstances of the Debtors' conduct, that they made the transfers with the actual intent to hinder, delay, or defraud SEPH.  Actual intent is required for purposes of § 727(a)(2)(A); constructive intent is not sufficient. *Marine Midland Business Loans , Inc. v. Carey (In re Carey*) 938 F.2d 1073, 1077 (10th Cir. 1991) ("To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors."); *In re*

*Wreyford,* 505 B.R. 47, 58 (Bankr. D. N.M. 2014).  To grant SEPH's motion for partial summary judgment the Court must be convinced that no reasonable fact-finder could fail to be persuaded that the Debtors made the transfers with that intent.[19]

As would be anticipated in such situations, SEPH has presented no direct evidence of the Debtors' intent, so it asks the Court to consider inferences that can be drawn from the circumstantial evidence of the Debtors' illicit intent, as judged by applying the so-called "badges of fraud." *United States Trustee v. Sieber (In re Sieber),* 489 B.R. 531, 545 (Bankr. D. Md. 2013) (courts rely on badges of fraud to determine fraudulent intent for purposes of § 727); *AB & T National Bank v. Goodwin (In re Goodwin),* 488 B.R. 799, 806 (Bankr. M.D. Ga. 2013). The badges of fraud include:

> (1) a lack or inadequacy of consideration;
>
> (2) the family, friendship or close associate relationship between the parties;

---

[19] While not argued by SEPH (and there is no binding Tenth Circuit precedent), there is a substantial body of law which holds that actual fraudulent intent is not always necessary to sustain an objection to discharge under § 727(a)(2)(A).  The phrase "hinder, delay, or defraud a creditor" is not defined in the Bankruptcy Code.  Because the language is phrased in the disjunctive, some courts find that it is sufficient to deny a discharge under 11 U.S.C. § 727(a)(2)(A) if the debtor intends to hinder or delay a creditor, which may fall slightly short of fraudulent intent. *See, e.g.*, *In re Retz,* 606 F.3d 1189,1200 (9th Cir. 2010) (stating that "[a] debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2)(A)") and that, "[b]ecause the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor."); *In re Wise,* 590 B.R. 401, 431 (Bankr. E.D. Mich. 2018) (collecting cases); *Bernard v. Sheaffer (In re Bernard),* 96 F.3d 1279, 1281 (9th Cir. 1996) (citations omitted) ("Denial of discharge ... need not rest on a finding of intent to *defraud*. Intent to hinder or delay is sufficient."); *Church Joint Venture v. Blasingame (In re Blasingame),* 2015 WL 13106325, at *15 (Bankr. W.D. Tenn. 2015), *aff'd,* 559 B.R. 692 (6th Cir. BAP 2016); *Wiggains v. Reed (In Re Wiggains),* 2015 WL 1954438, at *15 & n.144 (Bankr. N.D. Tex. 2015), *aff'd,* 848 F.3d 655 (5th Cir. 2017) (citing cases that have held that there are three separate grounds for denial of discharge based on the intent element under § 727(a)(2)(A)) ("In addition to those courts construing th[e] phrase ['intent to hinder, delay, or defraud'] to provide three alternative bases in the context of section 548(a)(1)(A), an abundance of courts have also interpreted the same phrase appearing in section 727(a)(2)(A) to offer three separate grounds.").

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

(6) the general chronology of events and transactions under inquiry.

(7) whether the transfer was disclosed or concealed;

(8) whether the debtor made the transfer before or after being threatened with suit by creditors (a variant of factor (5));

(9) whether the transfer involved substantially all of the debtor's assets;

(10) whether the debtor absconded; and

(11) whether the debtor was or became insolvent at the time of the transfer.

*In re Wreyford*, 505 B.R. 47, 58-59 (Bankr. D. N.M. 2014) (citing *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008); *Annino, Draper & Moore, P.C. v. Lang (In re Lang),* 246 B.R. 463, 469 (Bankr. D. Mass. 2000); *Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir. 2002).

Not all factors need be present in order to conclude that a fraudulent transfer has occurred; nor need they be given equal weight. *Wreyford*, 505 B.R. at 59. "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *In re Potter*, 2008 WL 5157877, at *7 (Bankr. D. N.M. 2008) (quoting *Acequia, Inc. v. Clinton (In re Acequia)* 34 F.3d 800, 806

(9th Cir. 1994); *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 854 (Bankr. N.D.

Tex. 2003), *aff'd* 299 B.R. 810 (N.D. Tex. 2003) (stating that "one of these factors may be

sufficient to find actual fraudulent intent; an accumulation of several such factors strongly

indicates that the debtor possessed the requisite intent"); See 5 *Collier on Bankruptcy*, ¶

548.04[1][b][ii] (Henry Sommer & Alan Resnick, eds., 16th Ed. 2012) ("Whatever badges

of fraud a court uses, no particular badge is necessary, nor is any combination sufficient.

The matter is always factual...."). With these standards in mind, the Court weighs the

badges of fraud as follows:

| Factor | Discussion |
|---|---|
| 1. Was there a lack of, or inadequate, consideration? | Yes. The Debtors received no consideration for their assignment of their membership interests in Oklamiss. |
| 2. Was there a familial, friendship, or close associate relationship between the parties? | Yes. The Debtors assigned their interests in Oklamiss to their children. |
| 3. Did Debtors retain possession, benefit, or use of the properties in question? | Yes. |
| 4. What was the financial condition of the party sought to be charged both before and after the transaction in question? | This factor weighs in favor of SEPH. The Oklamiss Transfer was reflected in a decrease in their financial statements. Their May 19, 2011, financial statement showed a net worth of $19,358,491. In a financial statement dated December 31, 2013, after the transfer, the Debtors reported a net worth of $312,446. |
| 5. The existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors? | This factor weighs in favor of SEPH. The Oklamiss Transfer was not an isolated transaction but one of several similar transactions putting their assets beyond the reach of creditors, including the creation of the Red Britt Trust, the NOG Transfer and the non-disclosure of |

33

Neverve's BP claim.

Prior to the transfer two loans from SEPH to David Stewart with a balance of $3.7 million had matured. SEPH loans to Neverve and another Stewart affiliate in the amount of $26 million which Debtors' had guaranteed were in default.

Overall, the analysis overwhelmingly favors SEPH in this case. The Court finds that David Stewart possessed the fraudulent intent to hinder or delay SEPH or any other creditor. The Court, however, cannot make the same finding for summary judgment purposes as to Terry Stewart. As discussed above, determining fraudulent intent is rarely made at the summary judgment stage — but this is not the usual summary judgment case. The Court's ability to listen to David Stewart's testimony, observe his demeanor and assess his credibility over the last seven years of litigation provides ample support to permit the Court to determine whether he acted with fraudulent intent.

This Court has previously stated on the record and in previous Opinions, and confirms here, that in many respects David Stewart was neither credible nor candid in much of his testimony, certainly in regard to the Oklamiss Transfer and BP Claims matters. As stated by the Court in its findings of fact, David Stewart misrepresented to the Court and creditors whether the BP Claims had been settled and the proceeds received. [UMF 58]. Furthermore, a review of David Stewart's former attorney's time records indicate numerous telephone conferences and email correspondence with Stewart regarding the settlement of the BP Claims. Beginning with the August 31, 2016 (and running through mid-2017), monthly billing statements reflect application of BP funds to the outstanding balances due for services in the bankruptcy and adversaries. If Stewart wasn't writing checks either on

his own behalf or on behalf of the non-debtor affiliates for the payment of the attorney fees, what did he think was the source of those payments?  It strains credulity that Stewart didn't know the source of the payments to his former attorney was the BP Claims Proceeds.  Yet, when asked at his deposition taken on June 27-28, 2017, whether any of the entities with which he was affiliated, other than Zeke or ZLM, had ever received funds related to the BP claims he answered, "I have not." [Doc. 127-46, pg. 617].  When asked whether any proceeds or payments of funds had been paid on a BP Claim by Neverve, Stewart answered, "I don't know." [Doc.127-46, pgs. 617-618] [UMF 58].

On the other hand, the Court has never seen or heard from Terry Stewart.  The Court is aware from her deposition testimony that she was not actively involved in the business transactions complained of by SEPH other than signing the documents, and she did not work in the business until the summer of 2015, after the bankruptcy was filed. [Doc. 129, Ex. A].  Terry Stewart testified that while she signed Oklamiss Transfer documents, including the profit and loss tax allocation agreement, she did so only because David Stewart told her to, and that she had no understanding as to what she was doing.  Her testimony, if taken as true, shows that she had little or no knowledge of her husband's machinations vis-à-vis SEPH or other creditors.

The Court may or may not accept Terry Stewart's protests of innocence or ignorance, as true.  Upon hearing all the evidence, the Court might not accept Terry Stewart's "ostrich burying its head in the sand" defense.  It may also be, as contended by SEPH, that Terry Stewart's execution of documents evidenced such a reckless indifference to the truth or a condoning of her husband's conduct so as to meet the fraudulent intent requirement under § 727(a)(2).  However, the Court cannot make that determination at this

35

stage of the proceeding.[20]    The Court must be guided by the general principles that summary judgment is rarely appropriate in cases which require a finding of fraudulent intent; that exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor; and the fraud of one spouse is not imputable to the wife based on the marital relationship alone.    *In re Butler,* 377 B.R. 895, 926 (Bankr. D. Utah 2006) ("[W]hether under § 727(a)(2) or (a)(4)(A), the intent to defraud requisite under 11 U.S.C. § 727 must be shown for each debtor....[T]he Code does not allow attribution of intent from spouse to spouse.")*; In re Tsurukawa,* 258 B.R. 192 (9th Cir. BAP 2001).  Not having yet had the opportunity to assess Terry Stewart's demeanor and credibility, the requisite fraudulent intent for SEPH's § 727(a)(2)(A) claim against her remains a factual issue not appropriate for disposition by summary judgment, either in favor of SEPH or in favor of Terry Stewart.

## C.  Debtors' Motion for Summary Judgement on SEPH's § 727(a)(3) Claim

The Debtors have moved for summary judgment on Count II of SEPH's *Second Amended Complaint* premised on § 727(a)(3) which bars a debtor from a discharge where "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information ... from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  "The purpose of § 727(a)(3) is to make the privilege of

---

[20] SEPH cites *Alamos Initial Bank v. Wreyford (In re Wreyford),* 505 B.R. 47, 53, 63 (Bankr. D. N.M. 2014) for holding that, although the wife "relied on" her husband "to make all business and financial decisions," she was denied a discharge because she "condoned.... and approved" the transfers in violation of § 727(a)(2)(A).  The court's holding in that case came after a two-day trial and not by summary judgment.  There, the court also found the wife not only signed the fraudulent transfer documents but, unlike the apparent situation presented here, she engaged in "active participation" in the business entity to which the subject funds were transferred.

discharge dependent on a true presentation of the debtor's financial affairs. This statute ensures that trustees and creditors will receive sufficient information to enable them to trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *In re Steffensen*, 534 B.R. 180, 196 (Bankr. D. Utah 2015) (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)). Disclosure of this information "removes the risk to creditors of the withholding or concealment of assets by the bankrupt under the cover of a chaotic or incomplete set of books or records." *Id.* at 197.

In order to state a prima facie case under § 727(a)(3), a plaintiff must show that the debtor "failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material business* transactions." *Brown*, 108 F.3d at 1295 (emphasis in the original). "In this context, 'impossible' should not be read to require a plaintiff to exhaust all theoretical means to determine the debtor's financial condition. '[A] party objecting to discharge need show only that it cannot ascertain the debtor's financial condition and recent business transactions *from the records provided*. It is not necessary to show that there is no conceivable way to ascertain the financial condition of the debtor.'" *Steffensen*, 534 B.R. at 197; *In re Stewart*, 263 B.R. 608, 615 (10th Cir. BAP 2001) ("The long-standing rule in the Tenth Circuit is that: 'Records need not be so complete that they state in detail all or substantially all the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them.'") (citing *Hedges v. Bushnell,* 106 F.2d 979, 982 (10th Cir. 1939). If plaintiff carries this burden, the burden then shifts to the debtor to justify his failure to keep and preserve adequate records. *Brown*, 108 F.3d at 1295.

"Unlike other provisions of § 727(a), the debtor's intent is not an element of a cause of action under § 727(a)(3). It is up to the bankruptcy court's broad discretion to determine on a case by case basis whether the records produced by the debtor are sufficient." *Steffensen*, 534 B.R. at 197.

In the Court's opinion, both SEPH and the Debtors miss the mark on the applicability of § 727(a)(3). Both parties argue that the basis of the claim is whether or not the documents related to the Oklamiss Transfer concealed or misled SEPH as to the true nature of the transactions, i.e. the documents indicating they were legitimate transfers when, in fact, evidence indicates they were an attempt to mislead the creditors. In that sense SEPH's § 727(a)(3) claim is predicated on the falsification of documents which is the same set of facts of fraudulent transfer, concealment or other disposition of assets which form the basis of SEPH's legitimate § 727(a)(2)(A) fraud claim and its alleged § 727(a)(4) claim for falsification of the Debtors' bankruptcy schedules. There is no claim, or evidence, that the Debtors destroyed or concealed records by which creditors could not determine their financial condition. The production of more than 40,000 documents evidences that the books and records were not concealed or destroyed. In fact, SEPH and the Trustee were able to relatively easily determine from the Debtors' books and records, including tax returns and financial records of their affiliated entities, the true nature of the Oklamiss, Red Britt Trust and NOG Transfers. This is not a situation where the Debtors failed to keep or turnover books and records that would allow the Trustee or the creditors to ascertain their financial condition of business transactions which is the purpose of § 727(a)(3). The books and records were turned over to the Trustee and to SEPH, and it is those records by which SEPH was provided the ammunition with which to bring the

38

numerous objections to discharge. Accordingly, the Debtors' motions for summary judgment as to SEPH's § 727(a)(3) are granted, albeit not on the same grounds as articulated by the Debtors.

### D. Denial of Discharge for False Oath Under § 727(a)(4).

In Count III of its *Second Amended Complaint*, SEPH asserts that Debtors knowingly and fraudulently made false oaths or account in disclosing assets and transactions in their Schedules and Statement of Financial Affairs ("SOFA") so as to deny them a discharge under the § 727(a)(4).[21]  In response, Debtors assert that to deny them a discharge under § 727(a)(4) any omissions or inaccuracies as to their assets as stated in their Schedules and/or SOFA must be accompanied by proof of fraudulent intent or reckless indifference to the truth which are factual matters not properly resolvable by summary judgment.  The Debtors also assert that the undisputed facts show that they are entitled to summary judgment on SEPH's false oath claims.

Notwithstanding the presumption in favor of a "fresh start," a debtor who seeks the protection afforded under the Bankruptcy Code has a duty to fully disclose the nature of his assets and financial affairs when completing his statements and schedules.  *Butler*, 377 B.R. at 914-15 ("In exchange for that 'fresh start,' the Code requires debtors to accurately and truthfully present themselves before the court."); *Wieland v. Gordon (In re Gordon)*,

---

[21] The only issue currently before the Court under § 727(a)(4) relates to the accuracy of the Schedules and Statement of Financial Affairs.  In its *Second Amended Complaint*, SEPH also asserted that David Stewart's testimony before the Court and in deposition relating to the receipt and use of the BP Claims Settlement Proceeds was false and thus actionable under § 727(a)(2).  There is little question in the Court's mind that David Stewart's testimony was, to put it mildly, highly problematic.  However, the Court has previously held that SEPH's § 727(a)(4) claim based upon allegedly false testimony relating to BP matters was barred for not having been timely brought. [See *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss or Strike Certain Allegations and Claims As Untimely*, Doc. 198].

526 B.R. 376, 387 (10th Cir. BAP 2015) ("[T]o be entitled to discharge, the debtor must deal

fairly with creditors and with the Court."); *The Cadle Co. v. King (In re King),* 272 B.R. 281,

300 (Bankr. N.D. Okla. 2002) ("The bankruptcy schedules and statement of affairs do not

ask the debtor to make an assessment of what *he* thinks are important assets or debts.

Debtors must, under oath, list *all* creditors and assets, as well as all transfers of property

within the prior year.") (emphasis in the original).

      A debtor's discharge may be denied if the debtor knowingly and fraudulently, in or

in connection with the case, makes a false oath. 11 U.S.C. § 727(a)(4)(A).  "A 'false oath'

may be either: (1) a false statement or omission in the debtor's schedules or (2) a false

statement by the debtor at an examination during the course of the proceedings." *In re

Garland*, 417 B.R. 805, 814 (10th Cir. BAP 2009).

      "To prevail on a claim for denial of discharge under § 727(a)(4)(A), the plaintiff must

establish the following elements by a preponderance of the evidence: (1) that the debtor

made a statement under oath; (2) that the statement was false; (3) that the debtor knew

the statement was false; (4) that the debtor made the statement with intent to defraud; and

(5) that the statement related materially to the debtor's bankruptcy case." *In re Splawn*, 376

B.R. 747, 759-60 (Bankr. D. N.M. 2007) (citing *In re Eigsti*, 323 B.R. 778, 783-84 (Bankr.

M.D. Fla. 2005). The subject matter of a false oath is material and warrants a denial of

discharge if it is related to the debtor's business transactions, or if it concerns the discovery

of assets, business dealings, or the existence of a disposition of the debtor's property.

*See, e.g.*, *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990).

      The burden of proof rests with the party opposing discharge, but "once it reasonably

appears that the oath is false, the burden falls upon the bankrupt to come forward with

evidence that he has not committed the offense charged." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987). The Debtor will not be denied a discharge if a false statement is due to mere mistake or inadvertence. *Brown,* 108 F.3d at 1294 (citing *In re Butler*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984)). Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge. *Id.* at 1295; *In re Magnuson*, 113 B.R. 555, 558-59 (Bankr. D. N.D. 1989). "However, 'reckless indifference to the truth... has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *In re Webb*, 2019 WL 2895000, at *7 (Bankr. N.D. Okla. 2019) (citing *In re Tully,* 818 F2d 106, 112 (1st Cir. 1987); *In re Croft*, 500 B.R. 823, 858 (Bankr. W.D. Tex. 2013). Reckless disregard means, "not caring whether some representation is true or false.'" *In re Webb,* 2019 WL 2895000, at *7 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998); *In re Wagner*, 527 B.R. 416, 430 (10th Cir. BAP 2015).

The "mistake" or "I didn't think it was important" defenses have their limits. "A debtor has an uncompromising duty to disclose *whatever* ownership interests are held in property," and "it is not for the debtor to pick and choose or obfuscate the answers." *Fokkena v. Tripp, (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) (emphasis in the original); *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("Debtors have an absolute duty to report whatever interest they hold in property, even if they believe the assets are worthless or are unavailable to the bankruptcy estate."); *Morrel, West & Saffa, Inc. v. Riley (In re Riley),* 128 B.R. 567, 569 (Bankr. N.D. Okla. 1991) ("The Debtor cannot omit information required of him simply because he believes or decides the property omitted has no value or the information is not necessary. This is for the creditors and the Court to decide."). Moreover, that duty of disclosure continues beyond the initial filings in the case

so that "[f]ailure to amend schedules after becoming aware of their inaccuracies is additional indicia of a debtor's reckless indifference to the truth." *Grassmann v. Brown (In re Brown)*, 570 B.R. 98, 116 (Bankr. W.D. Okla. 2017).  The cumulative effect of a large number of falsehoods in the debtor's schedules is evidence of reckless disregard for the truth, and is sufficient to circumstantially prove fraudulent intent under § 727(a)(4)(A).  *In re Crumley*, 428 B.R. 349, 366-67 (Bankr. N.D. Tex. 2010).

"Whether a debtor has made a false oath within the meaning of § 727(a)(4) is a question of fact.*" Webb*, 2019 WL 2895000, at *7 (citing *Williamson v. Fireman's Fund Insurance. Co*, 828 F.2d 249, 251 (4th Cir. 1987)).  Accordingly, it is generally difficult to determine the requisite fraudulent intent by summary judgment rather than by trial, and the Court does not deviate from this general principle lightly.[22]

Both the Debtors and SEPH have moved for summary judgment on SEPH's § 727(a)(4) claim that the Debtors' knowingly and fraudulently made a false oath in their Schedules.  Much, though not all, of that claim has focused on the disclosure and valuation of the Debtors' jewelry.  There is no doubt that there are substantial differences in the valuations of their jewelry in the Debtors' original Schedules and Amended Schedules and a huge difference between those valuations and the valuation of SEPH's expert witness.

---

[22] Both SEPH and the Debtors point out that this Court recently granted summary judgment on a § 727(a)(4) claim baring discharge where the debtor omitted information from his schedules. *In re Hickman*, 616 B.R. 815 (Bankr. W.D. Okla. 2020).  There, the facts were extreme.  Just before bankruptcy the debtor had received $25,000 from the sale of his interest in an LLC and deposited it into his wife's bank account.  Neither was reported in his Schedules or Statement of Financial Affairs.  Similarly, in the months leading up to bankruptcy the debtor began depositing his paychecks into his wife's newly created bank account and continued to do so until after he filed bankruptcy without disclosing the same.  As the court, stated this was "one of those cases in which the debtor's conduct was so egregious that the debtor's claim that he acted without fraudulent intent is so utterly implausible in light of the conceded or irrefutable evidence that no rational person could believe it." *Id.* at 824.

Debtors' original Schedules showed that they owned a combined total of $5,500 in jewelry. [UMF 45]. Documents from their jeweler, B.C. Clark, show that Debtors purchased substantially more jewelry than what they disclosed in their initial Schedules or their testimony at the Section 341 hearing.  Terry Stewart testified all of the jewelry that she owned was disclosed, and that certain items on the B.C. Clark inventory list were purchased for other people, including a diamond engagement ring for Terry Stewart's now daughter-in-law and "Jelly Beans Quartz Strips Michel Watches" for her daughter. [UMF 46].

In their Amended Schedules, filed after they learned that SEPH had issued a subpoena to jeweler B.C. Clark, Terry Stewart disclosed that she owned $7,012 in jewelry. This valuation of Terry Stewart's jewelry was based on appraisals by Kannard Jewelers, including: a $449 appraised value on a tanzanite ring that Debtors purchased for $7,475; a value of $176 on earrings that Debtors purchased for $2,400; a $7 value on a bracelet that Debtors purchased for $265; a $150 value on a cross and chain that Debtors purchased for $2,300; and a $900 value on diamond earrings that Debtors purchased for $6,250. [UMF 49].  In his Amended Schedules David Stewart listed his jewelry as having a value of $1,500. [UMF 48].  Terry Stewart's testified at deposition that she believed that the $7,012 valuation of the jewelry in the Amended Schedules was the price at which she could sell the jewelry to the jeweler who had valued it.[23]  The determination of the Debtors'

---

[23] The Amended Schedules (and the Kannard appraisal) did not include a diamond ring which Terry Stewart had given her daughter more than one year prior to bankruptcy.  Despite the transfer, the Debtors continued to insure the ring under their homeowners insurance for $36,000. Upon advice of counsel, the ring was returned to Terry Stewart.  When SEPH's expert appraised all of the jewelry on June 24, 2021, the ring was valued at $40,351, the highest valuation of any of the jewelry examined.

fraudulent intent may rest upon whether Debtors justifiably relied on the Kannard appraisals when they prepared their Amended Schedules.

At the time that both the Debtors and SEPH filed their respective motions for summary judgment, SEPH had not yet obtained an appraisal of the jewelry by an expert. That appraisal conducted on June 24, 2021, by J. Miles Dowd, placed a fair market value of $130,246 for some twenty-seven (27) items of jewelry for both David and Terry Stewart (the "Dowd Report").[24]   SEPH asserts that the difference in value between the Kannard appraisals and the purchase price as well as the huge difference between the scheduled values and the Dowd Report are proof that the Schedules carry the requisite fraudulent intent.   In the end that may well be true; however, while Mr. Dowd's credentials appear impressive, the Court is not aware that his appraisal has been subjected to cross-examination or other inquiry by counsel for the Stewarts.

"Because of the subjective nature of the appraisal process, courts are given wide latitude in determining value." *In re Patterson*, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007); *In re Byrd,* 2011 WL 2604765, at *3 (Bankr. D. Colo.  2011). "In other words, appraisal is an inexact science.  It is left to the trier of fact to determine which appraisal is better

---

[24] Four days after the Dowd appraisal was conducted SEPH filed its *Amended Reply to Terry Stewart's Response to SEPH's Motion for Partial Summary Judgment* to which was attached the Dowd Report. [Doc. 164, Ex. 1].   Debtors filed a *Motion to Strike* the Dowd Report as inadmissible for purposes of consideration of the motions for summary judgment because it was not accompanied by an affidavit establishing authentication. [Doc.168].  SEPH replied by filing its *Motion for Leave to Supplement the Summary Judgment Record* to permit the Court to consider the Dowd Report in the pending motions for summary judgment. [Doc. 177].  The Court has had the same under consideration, but contemporaneously with this Opinion is entering an order determining the Dowd Report to be admissible.  Its admission is not outcome determinative of the pending motions for summary judgment.  It is simply another piece of evidence creating a factual issue as to the value of the jewelry for ultimate consideration of the Debtors' fraudulent, or non-fraudulent, conduct in the filing of their Schedules.

grounded both in fact and method upon the Court's observation and evaluation of the witnesses and their respective reports." *Id.* (quoting *In re Hoch,* 2009 WL 2252144, at *2 (Bankr. D. Kan. 2009); *In re Wright,* 460 B.R. 581, 584 (Bankr. E.D. N.Y. 2011) (The Court "is not bound by values determined by appraisals but rather may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals." Morover, "[b]ecause the valuation process often involves the analysis of conflicting appraisal testimony, a court must necessarily assign weight to the opinion testimony received based on its view of the qualifications and credibility of the parties expert witnesses." *Id*. (quoting *Patterson*, 375 B.R. at 141); *Byrd*, 2011 WL 2604765, at *3). Particularly in regard to jewelry, there may be a significant discrepancy in appraisals. *See, e.g.*, *Glaser v. Chelec, Inc. (In re Glaser)*, 2002 WL 32375007 (Bankr. E.D. Va. 2002 ) ("As many a bankruptcy trustee has learned, there is often a surprising spread between the price at which jewelry was purchased and the price at which it can be sold.").  The Court therefore finds that the issue of the value of the jewelry for purposes of adjudicating SEPH's § 727(a)(4) claim is left for trial; accordingly, both SEPH's and Terry Stewart's motions for summary judgment on that claim are denied.

In addition to the discrepancy in value of the jewelry, SEPH points out other discrepancies in the disclosure of assets in the Debtors' original Schedules and their Amended Schedules. The Amended Schedules added a Polaris ATV, watches, David Stewart's wedding ring, two firearms, two Waverunners (possibly "non-operating" and worth $500) and an exercise bike.  The omission of these items from the original Schedules does not strike the Court as being of such substance that the Court can say as a matter of law as establishing fraudulent intent.  Moreover, there is evidence in the record that the Polaris

ATV was used, and possibly owned, by one of the Debtors' affiliates, NOG. There were a couple of other items including a possible powerboat and commercial boat propellers that are of greater concern; however, there was some evidence or testimony that the powerboat was owned by Debtors' son, Thad Stewart, and there exists the possibility that the commercial propellers may have been owned or used by entities owned by David Stewart. The Court needs additional evidence as to the use and ownership of this property and why they were omitted from the original Schedules. These issues are also best left for trial.

SEPH also argues that the disclosures and value of the Debtors' household goods and furnishings support their claim of false oath. The Debtors' original Schedules value the household goods and furnishings at $125,000. The Amended Schedules indicated a value of $50,000, but their homeowners policy indicated coverage for personal property of $1.1 million. The Court doesn't give much credence to the insurance value since most homeowners policies place the coverage value of the contents of the house on a percentage of the real property. There is no evidence, and likely none exists, that the insurance company did an actual inventory of the household goods and furnishings. The evidence is that the Debtors provided the Trustee with pictures of the rooms and contents of the house. The Trustee has testified that he found this degree of candor to be "extraordinary." The evidence adduced so far with regard to Debtors' household goods and furnishings does not establish a prima facie case for SEPH under § 727(a)(4), but neither is the evidence so insufficient to entitle the Debtors to summary judgment.

**E. Debtors' Motion for Summary Judgment on SEPH's § 727(a)(5) Claim.**

Debtors have moved for summary judgment on Count IV of SEPH's *Second Amended Complaint* seeking to bar their discharge under the provisions of § 727(a)(5).

46

Section 727(a)(5) states that the debtor will be denied a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities. The purpose underlying Section 727(a)(5) is to ensure that, prior to being granted a discharge, the debtor provides a full and accurate picture of his financial transactions and activities prior to bankruptcy, thereby preventing the burden of discovering, locating, and recovering assets from being shifted to the trustee and creditors." *In re Brown*, 570 B.R. 98, 118 (Bankr. W.D. Okla. 2017) (citing *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742-43 (Bankr. N.D. Okla. 2003). A *prima facie* case under Section 727(a)(5) exists where a creditor shows that there was an unusual and unexplained disappearance of assets shortly before the debtor filed bankruptcy. *Brown*, 570 B.R. at 118 (citing *In re Carlson*, 2008 WL 8677441, at *5 (10th Cir. 2008).

After the objecting party demonstrates a disappearance of assets, § 727(a)(5) requires the debtor to come forward with "a satisfactory explanation which must consist of more than vague, indefinite and uncorroborated assertions by the debtor." *Carlson,* 2008 WL 8677441, at *3 (quoting *Damon v. Chadwick (In re Chadwick)*, 335 B.R. 694, 703 (W.D. Wis. 2005)). In other words, a debtor's explanation regarding loss of assets should satisfy two concerns: It "must be supported by at least some corroboration," and that corroboration "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets." *In re Simmons,* 810 F.3d 852, 860 (1st Cir. 2016) (quoting *Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803, 817 (1st Cir. BAP 2005)).

Courts have generally determined that what constitutes a satisfactory explanation under § 727(a)(5) is left to the sound discretion of the court. *See Martinez v. Sears (In re*

*Sears),* 565 B.R. 184, 192 (10th Cir. BAP 2017) (citing *Blackwell Oil Co. v. Potts (In re Potts),* 501 B.R. 711, 726 (Bankr. D. Colo. 2013) (and cases cited therein). But, a determination as to whether an explanation is satisfactory does not take into account whether what happened to the assets was improper. *Carlson,* 2008 WL 8677441, at *5 (quoting *Shappell's Inc. v. Perry (In re Perry),* 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000)). That is because it is not necessary for a creditor to demonstrate a fraudulent intent on the debtor's part for purposes of denying a discharge under Section 727(a)(5). *Brown,* 570 B.R. at 118 (citing *Carlson,* 2008 WL 8677441, at *5); *In re McDonald*, 614 B.R. 801, 812 (Bankr. N.D. Ohio 2020); *In re Beatty*, 583 B.R. 128, 140 (Bankr. N.D. Ohio 2018) ("a plaintiff need not demonstrate wrongful intent on the part of the debtor in order to prevail on a § 727(a)(5) claim"); *Baker v. Reed (In re Reed);* 310 B.R. 363, 368 (Bankr. D. Ohio 2004) (§ 727(a)(5) "simply imposes strict liability" where the plaintiff meets his burden and the debtor does not provide an adequate explanation).

Debtors assert that "SEPH failed to even cite to one asset or liability that it contends is questionable or requires the Stewarts to provide an explanation" thus failing to meet its initial burden of proof regarding § 727(a)(5). [Doc. 130, pg. 19]. First of all, this is a motion for summary judgment, and SEPH is not required at this stage of the proceeding to introduce all facts necessary to establish its case. To obtain summary judgment in their favor, Debtors must show that there is no reasonable possibility that the finder of fact could rule in SEPH's favor. Second, the undisputed facts at this stage indicate that in the years leading up to bankruptcy, Debtors suffered massive amounts of unexplained loss of asset value: in a May 31, 2010, personal financial statement, the Debtors reported a net worth of $26,277,010; a May 19, 2011 personal financial statement reported a net worth of

48

$19,358,491; a December 31, 2012, personal financial statement reported a net worth of $7,677,138; and in a December 31, 2013, personal financial statement they reported a net worth of $312,646.

From the evidence the Court has heard over the last 7 years, the decreases in net worth are largely attributable to losses in the value of the Debtors' interest in Oklamiss and Raven Resources and perhaps other entities. Debtors' assertion that SEPH has not produced *any* evidence of asset losses is simply not true. A more detailed explanation of the assets at issue and the Debtors' explanation for their loss in value is a matter for trial.[25] The undisputed evidence shows that the Debtors' went from a net personal worth of approximately $54 million in 2008 to a net worth of $312,000 at the end of 2013. The Debtors argue that SEPH's reliance upon a loss in asset value from 2008 to the time of bankruptcy in 2014 is too far removed in time to state a § 727(a)(5) claim.

In contrast to many other provisions of the Bankruptcy Code relating to denial of a debtor's discharge, Section 727(a)(5) contains no express time limitation to the look-back period during which the loss or deficiency of an asset once held by the debtor warrants a satisfactory explanation. *Reed*, 310 B.R. at 369-70. Nevertheless, while not clearly defined, there is some limitation to the temporal proximity element of Section 727(a)(5). A debtor's interest in the asset may not "exist at a time too far removed from when the petition was filed." *Id.*; *In re Coppaken*, 572 B.R. 284, 325 (Bankr. D. Kan. 2017) ("The objecting creditor bears the initial burden of identifying missing assets by showing that the

---

[25] In support of their assertion that SEPH has failed to establish evidence of loss of assets the Debtors place primary reliance on the case of *In re May,* 579 B.R. 568 (Bankr. D. Utah 2017). The court's finding in that case that the creditor failed to make a *prima facie* case under § 727(a)(5) was after the conduct of a trial, not by way of summary judgment.

debtor *at a time not remote in time to case commencement*, had assets that would belong to the estate and that on the date of the petition no longer had those assets....") (citing *Straub v. Straub (In re Straub)*, 192 B.R. 522, 525 (Bankr. D. N.D. 1996) (emphasis added)). In *Straub* the court concluded that the alleged loss of assets occurring ten years, seven years, and six years prior to bankruptcy was too remote in time qualify under § 727(a)(5). Most courts recognize that a two-year period prior to the petition date is common, but that inquiries beyond that period may be warranted. *See, e.g., Blackwell Oil Co., Inc. v. Potts* (*In re Potts*), 501 B.R. 711, 724 (Bankr. D. Colo. 2013) (loss of equity in a business entity owned by debtors and worth approximately $1.4 million seven years before the petition date and sold three years before the filing for $30,000 was found to be not too remote); *In re Lindemann,* 375 B.R. 450, 472 (Bankr. N.D. Ill. 2007) (collecting cases); *See, e.g.*, *In re D'Agnese*, 86 F.3d 732 (7th Cir. 1996) (expanding the focus to nine years pre-petition); *In re Hermanson,* 273 B.R. 538 (Bankr. S.D. Ill. 2002) (six years before filing not too remote); *In re PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R.75 (Bankr. W.D. Pa. 2000) (eleven Ferrari automobiles worth $3.2 million sold four years before bankruptcy, art collection worth $100,000 valued four years earlier and a wine collection worth $90,000 eight years pre-bankruptcy all found to be not too remote in time).

Section 727(a)(5) invites the Court to use its reasoned judgment to determine whether the asset in question in any given case was owned by the debtor at a time too remote from the debtor's petition date. "How long is too long ago depends on the case; there is no hard and fast rule." *Potts,* 501 B.R. at 724 (citing *In re Olbur*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004)). Debtors themselves appear to recognize this flexibility in the look-back period by stating that "[a] look-back of two years is generally accepted, *though some*

*inquiries beyond this time frame may be warranted*." (emphasis added).  [Doc. 130, pg. 22].

The Court does not find that SEPH's reference to a diminution in asset value going back to 2008 is, as a matter of law, too remote in time for § 727(a)(5) purposes.  This is particularly true given the extraordinary size of the diminishment in value and the fact that it continued each year until shortly before bankruptcy.

### F. Debtors' Motion for Summary Judgment on SEPH's § 727(a)(6) Claim

Count V of SEPH's *Second Amended Complaint* asserts that both Debtors should be denied a discharge for their willful violation of the Court's *Preliminary Injunction Order* of January 5, 2017, [Adv. 16-1002, Doc. 32], under the provisions of § 727(a)(6) which denies discharge to a debtor who refuses "to obey any lawful order of the court." Specifically, SEPH claims that by approving a Consent Judgment on behalf of Raven Resources and assisting in the creation of a judgment lien in favor of Kirkpatrick Bank Debtors violated the *Preliminary Injunction Order* which prohibited them and Raven Resources from "selling, assigning, hypothecating, and/or otherwise conveying any assets owned by [Raven Resources]... to... a third party" without notifying SEPH and obtaining Court approval.[26]  The Debtors have moved for summary judgment on the basis that as a matter of law *they,* as opposed to perhaps non-debtor Raven Resources, did not violate the *Preliminary Injunction Order*.  That argument is transparently weak as David Stewart, who was subject to the Order, was obviously the agent of Raven Resources.

Regardless of whether the Court believes the Debtors did, or did not, violate the *Preliminary Injunction Order*, it need not reach the merits of that issue.  In its March 14,

---

[26] David Stewart approved the Consent Judgment on behalf of Raven Resources.  SEPH does not indicate how Terry Stewart violated the *Preliminary Injunction Order.*

2022, *Order Granting in Court and Denying in Part Defendant's Motion to Dismiss or Strike Certain Allegations as Untimely* [Doc. 198], the Court dismissed all of SEPH's § 727(a)(6) claims, whether premised upon the violation of the *Preliminary Injunction Order* or the alleged post-petition conversion of the BP Settlement Claims Proceeds, as having been brought untimely under the provisions of Fed. Bankr. R. P. 4004 and/or 4007. Accordingly, Debtors' motions for summary judgment as to SEPH's Count V § 727(a)(6) claims are denied as moot.

### G. Debtor David A. Stewart's Motion for Summary Judgment on SEPH's § 523(a)(2)(A) Objection to Dischargeability of a Debt[27]

In its § 523(a)(2)(A) claim set forth in Count VI of its *Second Amended Complaint*, SEPH alleged that "[o]n June 23, 2011, Mr. Stewart...induced [SEPH][28] to enter into a Second Supplement to Loan Documents..., which extended the maturity date of the Stewart Loan another three (3) years...by... pledging as additional collateral for the Stewart Loan certain claims against British Petroleum and others arising from the 2010 Deepwater Horizon Oil Spill." [Doc. 76, pg. 21]. The Second Supplement was executed by two limited liability companies as "Borrowers," on behalf of which David Stewart signed as Manager for both. Four limited liability companies signed as "Affiliates," two of which David Stewart signed as Manager. Stewart and two other individuals also signed the Second Supplement

---

[27] SEPH's *Second Amended Complaint* sets forth several basis for its § 523(a) claim, including David A. Stewart's participation in the use and concealment of the BP Settlement Claims Proceeds in 2016 to pay Stewart's counsel fees. By its Order of March 14, 2022, this Court struck/dismissed all claims related to use of the BP Settlement Claims Proceeds. The only remaining § 523(a) claim related to the BP Claims which is before the court on David Stewart's motion for summary judgment is the alleged fraud committed by him related to failing to disclose to SEPH in 2011 that two of his affiliates, Neverve and Shimmering Sands, were holders of BP Claims.

[28] Actually, Vision Bank, the predecessor in interest of SEPH.

as Guarantors. Neverve was never named as a Borrower, Affiliate or Guarantor, and did

not sign the Second Supplement. The Second Supplement granted the Lender a security

interest in any BP Claims or lawsuits which the Borrowers or Affiliates had.

While Neverve is neither named as a Borrower nor a signator, SEPH asserts that

there is language in the Second Supplement which expresses the intent of the parties,

including David Stewart as both a guarantor and as the agent/manager of two of the

entities which were Borrowers, to grant SEPH a security interest in any BP Claim which

was held by the non-signatory, affiliates Neverve and Shimmering Sands. The pertinent

language of the Second Supplement provided as follow:

> Borrowers acknowledge and agree that the parties hereto
> intend that all subsidiary companies and affiliate companies of
> Borrowers are to be parties to this Agreement and are to
> pledge their respective BP Collateral and bank accounts (as
> discussed below) as collateral for the Loan. To ensure the
> foregoing and to induce Bank to enter into this Agreement and
> extend the maturity date of the Loan, Borrowers and each
> Affiliate hereby represent and warrant unto Bank that there are
> no subsidiary or parent companies of any Borrower or any
> Affiliate, or any affiliate company of any Borrower (meaning
> any company owned directly or indirectly or in whole or in part
> by any Borrower or by any owner or principal of any Borrower),
> that has filed or possesses any BP Claims that are not a party
> to this Agreement, BP Collateral to any person or entity other
> than Bank....

[Doc. 76, pg. 23].

It is not disputed that at the time of the execution of the Second Supplement,

Nererve and Shimmering Sands held BP Claims, and SEPH asserts that David Stewart's

inducement of SEPH to enter into the Second Supplement without disclosing the same

constitutes non-dischargeable fraud under § 523(a)(2)(A). On the other hand, Stewart

contends that there can be no non-dischargeable fraud because the debt to SEPH had

53

already been incurred prior to any alleged misrepresentations or actual fraud. Thus, Stewart argues that he is entitled to summary judgment because SEPH has not, and cannot, show that he "*obtained* money, property, services, or credit *by the actual fraud*" or that "*the debt arises from the actual fraud*" as required by the statute. (emphasis in original.) [Doc. 130, pg. 28]. Stewart's argument is unavailing.

Stewart ignores the express language of § 523(a)(2) which makes it applicable not only to fraud by which the debtor "obtains" money or services or by which a "debt arises" but also to fraud connected to the "obtaining" of "*an extension, renewal, or refinancing of credit.*" 11 U.S.C. § 523(a)(2) (emphasis added). The Second Supplement recited that consideration for the same was "to induce Bank to *extend* the maturity date" of a $16 million Promissory Note which had been executed by affiliated entities of Stewart and personally guaranteed by him in 2009. (emphasis added). The November 10, 2010, maturity date of the prior Amended Promissory Note guaranteed by Stewart had long since expired, and the Second Supplement, which was made retroactive to the expired maturity date, was executed to induce SEPH's forbearance to demand the obligation to it due and payable.

The Tenth Circuit has found that because "[a]n extension, within the meaning of § 523(a)(2), is 'an indulgence by a creditor giving his debtor further time to pay the existing debt,'" the Bankruptcy Code protects a creditor "who is deceived into forbearing from collection without being given an opportunity to grant or deny the extension of credit." *In re Gerlach,* 897 F.2d 1048, 1050 (10th Cir. 1990) (quoting *Takeuchi Mfg. (US), Ltd. v. Fields (In re Fields),* 44 B.R. 322, 329 (Bankr. S.D. Fla. 1984); *See also Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126 (4th Cir. 1999) (holding that agreements "substituting

54

new debt obligation for previously existing debt, qualified as 'refinancing' of credit, within the purview of exception to discharge for debts obtained through false pretenses, false representation or actual fraud" under § 523(a)(2)); *Ojeda v. Goldberg*, 599 F.3d 712, 719 (7th Cir. 2010) ("We think it is abundantly clear that a fraudulently induced forbearance fits squarely within these definitions [of 'extension' or 'renewal'], and note that other circuits have reached the same conclusion"); *In re Hay Phat,* 623 B.R. 371, 377-78 (Bankr. E.D. Pa. 2021) (collecting cases); *In re Escoto*, 2015 WL 2343461, at *8 (9th Cir. BAP 2015) (finding that a request for an extension of the due date, while failing to disclose key facts driving decision, would be a sufficient frustration of the creditor's rights to find the debt non-dischargeable). As one commentator has noted, "A wise debtor who cannot pay a dischargeable debt files for bankruptcy to discharge it, but a foolish debtor who cannot pay a debt seeks an extension through misrepresentations and potentially turns that dischargeable debt into a permanent one." Murray, *Is a Forbearance an "Extension of Credit" Triggering § 523(a)(2)?*, Am.Bankr.J., Vol. LXI, No. 6 (June 2022).

SEPH alleges that Stewart made "false pretenses," "false representation" and committed "actual fraud" in leading SEPH to believe that there were no non-signatory Stewart affiliates holding BP claims, including Neverve and Shimmering Sands. In other words, he "obtained" the extension, renewal or refinancing by fraudulently representing that there were no other unnamed affiliates i.e., Neverve or Shimmering Sands which had BP claims.

While it is not alleged that Stewart made any *affirmative* statements (misrepresentations) as to the BP Claims, a misrepresentation is not necessary. Where there is a duty to speak both concealment and silence can constitute fraudulent

55

representations. *In re Alvarado*, 608 B.R. 877, 884 (Bankr. W.D. Okla. 2019). As stated in *In re Hentges*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007):

> When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). Moreover, "false pretenses as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.' An overt misrepresentation is not required, because 'omissions or failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor.'" (citations omitted).

Courts look to the Restatement (Second) of Torts § 551(1) & (2) to determine whether a party has a duty to disclose: Section 551(1) provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

*See In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1272 (10th Cir. 2019); *Level 3 Communications, LLC v. Liebert Corp.*, 535 F.3d 1146, 1163-64 (10th Cir. 2008). The Restatement then describes five situations, three of which may be applicable here, when a duty to disclose might arise:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

> (b) matters known to him that he knows to be necessary to
> prevent his partial or ambiguous statement of the facts from
> being misleading; and
> ...
> (e) facts basic to the transaction, if he knows that the other is
> about to enter into it under a mistake as to them, and that the
> other, because of the relationship between them, the customs
> of the trade or other objective circumstances, would
> reasonably expect a disclosure of those facts.

Restatement (Second) Torts § 551(2)(a)-(e). Each subsection of § 551(2) gives rise to an independent duty to disclose. *See, e.g.*, *Alpine Bank v. Hubbell,* 555 F.3d 1097, 1109-12 (10th Cir. 2009); *Level 3 Communications, LLC*, 535 F.3d at 1163-64). As colorfully stated by Judge Terrance Michael: "When it comes to a claim for false pretenses, silence is anything but golden. The question is whether, by silence, insinuation, or inference, Debtor knowingly acted in such a fashion as to create a false impression in the mind of (the creditor)...." *In re Woods*, 616 B.R. 803, 813 (Bankr. N.D. Okla. 2020).

While SEPH still has the burden of proving all the elements of fraud by false pretenses, misrepresentations or actual fraud, the Court cannot find that under the record before it such claims are as a matter of law excluded from § 523(a)(2) as asserted by David Stewart in his Motion for Summary Judgment.[29]

---

[29] Stewart's reliance upon the United States Supreme Court in *Husky International Electronics, Inc. v. Ritz,* 578 U.S. 356, 136 S.Ct. 1581 (2016) is misplaced. The precise issue on appeal to the Supreme Court was whether the Fifth Circuit had erred in holding that in a fraudulent transfer "a necessary element of 'actual fraud' is a misrepresentation from the debtor to the creditor." *Id*. at 1586. *Husky's* holding was that "[b]ecause we must give the phrase 'actual fraud' in § 523(a)(2)(A) the meaning it has long held, we interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation." *Id*. at 1590. SEPH's § 523(a)(2)(A) does not arise in the fraudulent transfer context. It is a straight-forward claim that Stewart obtained the renewal, extension or refinancing of his and his affiliates' debt by fraud.

## VI. Conclusion

The Court is mindful that objections to discharge should be construed liberally in favor of debtors and strictly against the objecting parties. However, a bankruptcy discharge is a privilege reserved for the honest debtor. Plaintiff SEPH has, based on the undisputed material facts, as supplemented by the Court's personal observation and assessment of the conduct and credibility of David Stewart over extended weeks of evidentiary hearings, met its burden by a preponderance of the evidence with respect to its § 727(a)(2)(A) objection to discharge as to Defendant David A. Stewart. Said Defendant has not presented sufficient evidence to overcome the inference of fraudulent intent. SEPH's Motion is granted in part, and said Defendant is denied a discharge under § 727(a)(2)(A).

In normal circumstances, having determined that David Stewart is denied a discharge under one subsection of § 727(a), the Court might need not consider SEPH's claims against Defendant David A. Stewart under other sections of § 727(a) or under § 523 (a)(2) as being moot. However, given the interlocutory nature of the Court's Order, the likelihood of an appeal from the eventual determination of that or any other claim and to assist in the clarification or narrowing of any issues remaining for trial, the Court is ruling upon all of the parties' claim in their respective motions for summary judgment. In conformity with the findings and conclusions above,

**IT IS ORDERED** that;

1. *SEPH'S Motion for Partial Summary Judgment* [Doc. 127] as to Count I of its *Second Amended Complaint* seeking denial of a discharge against Defendant/Debtor David A. Stewart predicated on his transfer of property of the estate to his children, family members and/or the Red Britt Trust (the "Oklamiss Transfer") under § 727(a)(2)(A) is

58

hereby **Granted**.

2. *SEPH'S Motion for Partial Summary Judgment* [Doc.127] as to Count I of its *Second Amended Complaint* seeking denial of a discharge against Defendant/Debtor Terry P. Stewart predicated on the transfer of property of the estate to her children, family members and/or the Red Britt Trust (the "Oklamiss Transfer") under § 727(a)(2)(A) is hereby **Denied**;

3. *SEPH'S Motion for Partial Summary Judgment* [Doc. 127] as to Count III of its *Second Amended Complaint* seeking denial of a discharge against Defendants/Debtors David A. Stewart and Terry P. Stewart for false oaths predicated upon § 727(a)(4) is hereby **Denied.**

4. *Defendant Terry P. Stewart's Motion for Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 129] as to Count I under § 727(a)(2), Count III under § 727(a)(4) and Count IV under § 727(a)(5) of the *Second Amended Complaint* is hereby **Denied**;

5. *Defendant David A. Stewart's Motion For Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 130] as to Count I under § 727(a)(2), Count III under § 727(a)(4) and Count IV under § 727(a)(5) of the *Second Amended Complaint* is hereby **Denied**

6. *Defendant Terry P. Stewart's Motion for Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 129] as to Count II of the *Second Amended Complaint* under § 727(a)(3) is hereby **Granted**;

7. *Defendant David A. Stewart's Motion For Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 130] as to Count II of the *Second Amended*

*Complaint* under § 727(a)(3) is hereby **Granted**

    8.  *Defendant Terry P. Stewart's Motion  for Summary Judgment As To The Claims of Plaintiff SE Property Holdings, LLC* [Doc. 129] and *Defendant  David A. Stewart's Motion For Summary Judgment As To The Claims of  Plaintiff SE Property Holdings, LLC* [Doc. 130] as to Count V of the *Second Amended Complaint* under § 727(a)(6) are determined to be **Moot**, the Court having dismissed said Count by its *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Or Strike Certain Allegations and Claims As Untimely* of March 14, 2022. [Doc.198].

    9.  *Defendant David A. Stewart's Motion For Summary Judgment As To The Claims of  Plaintiff SE Property Holdings, LLC* [Doc. 130] as to Count VI of the *Second Amended Complaint* under § 523(a)(2)(A) is **Denied.**

**#  #  #**
