**Dated: July 2, 2026**

**The following is ORDERED:**





Janice D. Loyd
U.S. Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| David A. Stewart and Terry P. Stewart, | ) | Case No. 15-12215-JDL |
| | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| SE Property Holdings, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 16-1087-JDL |
| | ) | |
| David A. Stewart and Terry P. Stewart, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER GRANTING DISCHARGE

### I.  Introduction

This adversary proceeding is before the Court for decision after a three-day trial.

Plaintiff, SE Property Holdings, LLC ("SEPH") commenced this adversary proceeding

seeking to bar Debtor Terry Stewart ("Terry") a discharge under 11 U.S.C. § 727(a)(2)(A)

(transfer of property with the intent to hinder, delay, or defraud a creditor), (4) (false oath,

primarily by grossly undervaluing her jewelry in the schedule of assets filed with the court) and (5) (failure to satisfactorily explain any loss of assets).[1]

After considering the arguments of counsel, the documentary and testimonial evidence and weighing the credibility of the witnesses, in accordance with Fed. R. Bankr. P. 7052, the below constitutes the Findings of Fact and Conclusions of Law in support of the Court's grant of a discharge to Defendant/Debtor Terry Stewart. A separate judgment will be entered pursuant to Rule 9021.

## II.  Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), and 157(a) and the Order of Reference of the United States District Court for the Western District of Oklahoma as Local Rule LCvR 81.4(a).  This matter seeking a determination of an objection to discharge is a core proceeding under 28 U.S.C. § 157(b)(2)(J) over which this Court has authority to enter a final order. Furthermore, pursuant to Rules 7008 and 7012 the parties have consented to the entry of final orders or judgment by the bankruptcy court. Venue is proper pursuant to 28 U.S.C. § 1409(a).

---

[1] Unless otherwise indicated, all statutory references and citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101-1532.  All references to "Rule" or the "Rules" are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.").

SEPH's Complaint was also brought against Terry's husband and co-debtor, David Stewart, upon numerous grounds under § 727 and § 523(a). Both SEPH and the Debtors thereafter filed cross-motions for summary judgment. On August 3, 2022, the Court entered its *Opinion and Order Upon Cross-Motions for Summary Judgment* [Doc. 200] (the "*Summary Judgment Order*"), granting summary judgment against David Stewart barring his discharge under § 727(a)(2)(A), rendering SEPH's remaining claims against David Stewart moot. Thus, the only remaining claims which proceeded to trial were those seeking to bar Terry's discharge.

### III. Findings of Fact

Many, but not all, of the facts upon which this trial was based are facts already determined by this Court in its *Summary Judgment Order* and/or were stipulated to by the Parties in the *Final Pretrial Order* [Doc. 228]. Additional facts upon which this Opinion are based are contained in the body of this Opinion. The facts stipulated to in the *Final Pretrial Order* are as follows:

### I. The Alleged Fraudulent Transfers and Concealment

#### A. The "Oklamiss Transfer"

1. Debtors[2] created Oklamiss Investments, LLC ("Oklamiss") on September 27, 1999.

2. From the formation of Oklamiss until the effective date of the purported Oklamiss Transfer, Debtors each owned 50% of the membership interests in Oklamiss.

3. Amongst other assets, Oklamiss owns 99% of the membership interests in Raven Resources, LLC ("Raven Resources"), while David holds the remaining 1%.

4. Debtors' ownership of Oklamiss contributed substantially to their net worth. In the May 19, 2011, financial statement, Debtors reported that Oklamiss' real estate was worth more than $4.2 million. The financial statement also reflected secured debt on those real estate assets of more than $5.5 million. Debtors further valued Raven Resources at $20 million. In this financial statement, Debtors reported a total net worth of $19,358,491.

5. Debtors purported to transfer 98% of their interest in Oklamiss to their children,

---

[2] The term "Debtors" when used herein refers to both David Stewart and Terry Stewart jointly. When referred to separately, David Stewart is referred to as "David" and Terry Stewart as "Terry."

3

Thad Stewart, Neal Stewart and Jena Stewart Rush (collectively, the "Stewart Children"). After this alleged transfer, the Stewart Children each held a 32.66% interest in Oklamiss, while Debtors each retained a 1% interest in Oklamiss.

6. Each of the Debtors, David Stewart and Terry Stewart, executed the transfer documents.

7. The Stewart Children did not pay any consideration for the transfer of the interests in Oklamiss.

8. The face of the document reflecting the Oklamiss Transfer is dated October 31, 2011, with the effective date of January 1, 2012.

9. Debtors' December 31, 2012, financial statement shows that they owned a 100% membership interest in Oklamiss.

10. The 2013 tax returns for Oklamiss continued to show that Debtors owned 100% of the interest in Oklamiss.

11. Raven Resources' former in-house counsel (Linda McGuire), former in-house accountant (Dan Neale), and former outside accountant (Dennis Lakely) testified that they did not learn of the Oklamiss Transfer until late 2013 or early 2014.

12. Debtors' daughter, Jena Stewart Rush – a purported recipient of substantial interests – was not aware of the alleged Oklamiss Transfer until 2013.

13. Although David contends that the Oklamiss Transfer was a gift, Debtors did not file a gift tax return.

14. David maintained complete control over Oklamiss even after the alleged transfer. The transfer document stated that "David Stewart shall remain Managing Member (of Oklamiss) until he resigns or 12/31/2023, whichever occurs first."

4

15. The Stewart Children have received no distributions from Oklamiss and have paid no expenses associated with Oklamiss.

16. Debtors continued to receive all distributions from Oklamiss.

17. The Debtors and the Stewart Children signed documents agreeing that "all losses and profits attributable to Oklamiss... will be credited to [Debtors']... tax return[s]."

18. The Oklamiss Transfer was reflected in a decrease in the Debtors' net worth in their financial statements. Their May 19, 2011, financial statement showed a net worth of $19,358,491. In the financial statement dated December 31, 2013, in which Debtors disclosed the Oklamiss Transfer, Debtors reported a net worth of $312,446.

19. Two loans from SEPH to David matured on December 3, 2009, and December 22, 2011.  These two loans had an outstanding balance in excess of $3.7 million.

20. Debtors were guarantors on loans to Neverve, LLC ("Neverve") and ZLM Acquisitions, L.L.C. ("ZLM") with balances in excess of $26 million.

21. In 2012 and 2013, SEPH initiated multiple actions against Debtors and entities for which Debtors were guarantors, including *SE Property Holdings, LLC v. David A. Stewart, et al.*, Case No. 1:12-cv-00537-CB-M (S.D. Ala.) (filed Aug. 24, 2012); *SE Property Holdings, LLC v. David A. Stewart,* Case No. 1:13-cv-00609-KD-C (S.D. Ala.) (filed  Dec. 12, 2013); and *SE Properties Holdings, LLC v. ZLM Acquisitions, L.L.C. et al.,* Case No. 1:13-cv-00610-CG-N (S.D. Ala.) (filed  Dec. 13, 2013).

22. SEPH obtained summary judgment against Debtors in relation to the guarantees on the Neverve loans on May 19, 2014.

5

**B. The NOG Transfer - The Red Britt Trust**

23. In the spring of 2014, David suggested to his mother, Ruth Carroll, that she form the Red Britt Irrevocable Trust ("Red Britt Trust") to hold approximately $65,000.00 for unpaid royalties (the "Royalty Debt") purportedly due to her from Raven Resources.

24. David suggested the creation of the Trust to outside counsel for Debtors and the entities they controlled (email from David Stewart asking outside counsel "[h]ow much and how long would it take set up an irrevocable trust [?]").

25. Ruth Carroll was not present for any of the discussions about creating the Red Britt Trust.

26. Ruth Carroll testified that she "didn't feel [she] was owed" the Royalty Debt which purportedly was the consideration for the her being the Settlor of the Red Britt Trust.

27. When Ruth Carroll stopped receiving royalty checks in 2008, she did not inquire about the status of the royalties or attempt to collect any amounts due.

28. At the direction of David, Ruth Carroll executed documents creating the Red Britt Trust.

29. Debtors' daughter, Jena Stewart, was the Trustee, David the primary beneficiary of the Red Britt Trust and Terry Stewart and the Stewart Children were secondary beneficiaries.

30. The Red Britt Trust had an effective date of March 19, 2014, but was not signed until July 23, 2014.

31. Along with the Red Britt Trust paperwork, Ruth Carroll, at the direction of David and in-house counsel, assigned the Royalty Debt to the newly-created NOG, LLC ("NOG") in exchange for membership interests in NOG.

6

32. David then caused Raven Resources to transfer unencumbered interests in multiple oil and gas properties to NOG, allegedly to satisfy the Royalty Debt.

33. David executed assignments on behalf of Raven Resources to NOG on April 1, 2014; however, those assignments were not recorded with any County Clerk until late June and early July of 2014.

34. David selected the interests that were transferred from Raven Resources to NOG.

35. The Walking Woman Well, one of the properties conveyed in the Raven Resources/NOG Transfer, was a "good well," and the value of the assets conveyed from Raven Resources to NOG "went up considerably" when the Walking Woman Well came on line and started producing after the transfer.

36. After the NOG Transfer, David, on behalf of NOG, executed an assignment of the ownership interests of NOG to be transferred to the Red Britt Trust.

37. David continued to act as manager for NOG after the NOG Transfer.

38. While Jena Rush, the Debtors' daughter, was the trustee of the Red Britt Trust, David Stewart retained absolute control over the entities and assets within the Red Britt Trust. Jena Rush testified that the only decision she made with respect to the assets of the Red Britt Trust was to direct her father to use trust funds to buy football tickets for the benefit of Jena and other members of the Stewart family.

39. Jena Rush testified that she took no other actions to control and manage the assets of the Red Britt Trust, and she never reviewed any accounting or financial statements for the Red Britt Trust.

40. David maintained absolute control over the entities conveyed to the Red Britt

7

Trust.

41. Raven Resources' in-house counsel conceded that the purpose of the Red Britt Trust was to "protect" the property "[f]rom creditors" for the benefit of the Stewart Children.

## II.  The False Oaths

42. SEPH filed the Involuntary Petition on September 30, 2014 (the "Petition Date").

43. Debtors, through their Alabama counsel, filed their initial Schedules and Statement of Financial Affairs ("SOFA") on May 1, 2015.

44. Debtors filed their Amended Schedules and SOFA on September 29, 2015.

45. In their initial Schedules, Debtors disclosed that they owned a combined total of $5,500 in jewelry. During the Section 341 meeting of creditors, David testified that he owned a Rolex watch, which he valued at $500 in his initial Schedules and SOFA. Terry testified that she owned "a Rolex," "a wedding ring," "a band," a "little baby ring ... worth a couple hundred dollars," "a Tanzanite ring," and "a few [other] things."

46. Documents from jeweler B.C. Clark show that David purchased more jewelry than what Debtors disclosed in their initial Schedules or their testimony at the Section 341 hearing. Terry Stewart testified all of the jewelry that she owned was disclosed, and that certain items on the B.C. Clark inventory list were purchased for other people, including a diamond engagement ring for Terry's now daughter-in-law and "Jelly Beans Quartz Strips, Michele Watches" for her daughter.

47. Debtors produced photographs of the jewelry purportedly in their possession. Those photographs show that Debtors owned at least six necklaces, four watches, three pairs of earrings, three bracelets and six rings.

48. In his Amended Schedules, David disclosed that he owned $1,500 in jewelry,

8

including the Rolex watch valued at $1,200. For the first time, David also disclosed in his Amended Schedules that he owned a Tag Heuer watch, which he valued at $250.

49. In her Amended Schedules, Terry disclosed that she owned $7,012 in jewelry. This valuation of Terry's jewelry was based on Kannard Jewelers placing a $449 appraised value on a Tanzanite ring that Debtors purchased for $7,475; a value of $176 on earrings that Debtors purchased for $2,400; a value of $7 on a bracelet that Debtors purchased for $265; a value of $150 on a cross and chain that Debtors purchased for $2,300; and a value of $900 on diamond earrings that Debtors purchased for $6,250.

50. Debtors made these amendments to their Schedules after they learned that SEPH had issued the subpoena to B.C. Clark (subpoena issued on August 31, 2015).

51. Terry transferred a ring to her daughter, Jena Rush, as a wedding gift more than one year prior to her filing bankruptcy. According to the Debtors' homeowners insurance policy the ring was valued at $36,600.

52. Debtors continued to insure the ring after the transfer to Jena Rush.

53. More than one year prior to the date of bankruptcy, Terry gave Jena Rush a diamond tennis bracelet and a diamond necklace and gave her daughter-in-law a pair of earrings.

54. Raven Resources' in-house counsel, Linda McGuire, testified that she told David that she thought Terry had undervalued her jewelry in her original Schedules, at which point Terry told McGuire that she had given some of the jewelry to her daughter Jena Rush. Linda McGuire told Terry that she will "likely have to get [the jewelry] back" from Jena Rush.

55. A registration "renewal/transfer" of an Everglades boat referenced a renewal

9

date of September 30, 2015, with the registered owner as the Debtors' son, Thad Stewart.

After the transfer of the boat, an umbrella liability policy owned by the Debtors included

coverage for a "powerboat" as a Rated Exposure. (The policy listing the Debtors' son, Thad

Stewart, as a driver).

56. The Debtors' initial Schedules and their testimony at the Section 341 meeting

did not disclose ownership of an all-terrain vehicle ("ATV"). In subsequent testimony, David

stated that a Polaris ATV had been assigned to NOG for no consideration to be used on

one of NOG's oil and gas leases.

### IV. Discussion

**A. Issues to Be Tried**[3]

Based on both the Court's *Summary Judgment Order,* which denied David a

discharge and narrowed the issues to be tried against Terry, and the *Final Pre-Trial Order*

[Doc. 228], the claims in SEPH's *Second Amended Complaint* [Doc. 76] tried against Terry

were:

**1. Count I.** Whether Terry Stewart had fraudulent intent under § 727(a)(2)(A) with

regard to: (1) the transfer of her and Co-Debtor David Stewart's 98% membership interest

in Oklamiss, LLC to their children (the "Oklamiss Transfer); (2) the creation of the Red Britt

Irrevocable Trust (the "Red Britt Trust"); and/or (3) the transfer of assets of Raven

---

[3] In its *Summary Judgment Order*, the Court made a number of findings and rulings, some of which were adverse to David Stewart and/or SEPH. The Parties agreed, as does the Court by virtue of its approval of the *Final Pretrial Order*, that they are not re-litigating those issues previously decided by the Court. The Parties have agreed, as reflected by the *Final Pretrial Order*, that they are preserving any appellate rights which they may have with regard to the Court's prior findings and rulings, and that the Parties' agreement as set forth in the *Final Pretrial Order* will not prejudice any rights, claims, or defenses on appeal or on remand if any such determinations are reversed. [*Final Pretrial Order*, Doc. 228 pg. 2 n.1].

Resources to NOG LLC and its transfer of its interests to the Red Britt Trust.[4]

**2. Count III.** Whether Terry Stewart made a false oath within the meaning of § 727(a)(4)(A) in her undervaluing and/or omitting property in her Schedules, Statement of Financial Affairs ("SOFA"), Amended Schedules, Amended SOFA, and/or her testimony, particularly with regard to the value and ownership of jewelry.

**3. Count IV.** Whether Terry Stewart has come forward with a satisfactory explanation within the meaning of § 727(a)(5) for the loss or diminution of her assets and alleged net worth between 2008 and 2013.

### B. Standards for Denying Discharge

A "central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659 (1991). As the mantra of bankruptcy goes, a discharge of indebtedness in bankruptcy is reserved for the "honest but unfortunate debtor." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699 (1934). In order to effectuate this "fresh start" policy of bankruptcy relief, exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor. It is a well-established rule that exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor. *Kawaauhua v.*

---

[4] In the *Final Pretrial Order* the Parties stipulated that a factual issue to be tried was Terry's fraudulent intent with regard to her participation in the Oklamiss Transfer. There was no such factual stipulation in the *Final Pretrial Order* with regard to the § 727(a)(2) issues relating to the Red Britt Trust or the NOG Transfer. As discussed herein, there was no evidence that Terry participated in the creation of the Red Britt Trust or the NOG Transfer.

11

*Geiger (In re Geiger)*, 523 U.S. 57, 62, 118 S.Ct. 974, 799 (1998); *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305 (1995); *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997) (acknowledging generally "that the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor.").

Despite the policy of the "fresh start," "to be entitled to discharge, the debtor must deal fairly with creditors and with the court." *Wieland v. Gordon (In re Gordon),* 526 B.R. 376, 387 (10th Cir. BAP 2015). "The bankruptcy system is set up to protect 'honest but unfortunate debtors,' not those who would abuse it to further their own interests." *Id.* at 397. "A discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."(citation modified), *Wieland v. Gordon (In re Gordon)*, 509 B.R. 359, 370 (Bankr. N.D. Okla. 2014) (quoting *In re Juzwiak*, 89 F.3d. 424, 427 (7th Cir. 1996).

The burden of proof for establishing an exception to discharge is a preponderance of the evidence. *Grogan*, 498 U.S. at 287-88, 111 S.Ct. at 659-60. In order to obtain a denial of a discharge, plaintiff "must prove each statutory element by a preponderance of the evidence." *Gordon*, 509 B.R. at 370. Once a plaintiff "establishes *a prima facie* case for denying Defendant's discharge under § 727, the burden of going forward shifts to the Defendant." *Id.* "The various discharge exceptions of § 727(a) are independent, and a plaintiff need only prove the elements of one exception by a preponderance of the evidence in order to obtain a denial of discharge." *Gordon*, 526 B.R. at 394.

12

### C. The Transfer of the Oklamiss Membership Interests Under § 727(a)(2)[5]

SEPH asserts that Terry should be denied a discharge as result of the alleged fraudulent transfer of assets in an attempt to hinder, delay, and defraud their creditors pursuant to 11 U.S.C. § 727(a)(2). Terry asserts that there was insufficient evidence produced to find that her participation in the transfer of the assets complained of by SEPH was accompanied with fraudulent intent.

Section 727(a)(2)(A) of the Bankruptcy Code, provides:

> (a) The court shall grant the debtor a discharge, unless –
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred ... or concealed, or has permitted to be transferred ... or concealed –
>
> > (A) property of the debtor, within one year before the date of the filing of the petition ....

Under this section, a debtor is not entitled to receive a discharge if the debtor: (1) transfers or conceals; (2) property of the estate; (3) within one year of the petition date; (4) "with the intent to hinder, delay, or defraud a creditor." *Brown*, 108 F.3d at 1293. To deny Terry a discharge under § 727(a)(2)(A), SEPH must establish by a preponderance of the evidence that she violated this provision. *First National Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991) (standard of proof under § 727(a)(2) is

---

[5] As will be discussed below, the Court will be addressing two separate transfers designated as the "Oklamiss Transfer" and the "NOG Transfer." SEPH had also made claims that the transfer of the BP Settlement Proceeds, which were paid to the Debtors' counsel by David, also fell within its § 727(a)(2)(A) claims. By the Court's *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss or Strike Certain Allegations and Claims as Untimely* [Doc. 198], the claims related to the BP Settlement Proceeds were dismissed as untimely brought. Therefore, the claims will not be addressed herein.

13

preponderance of the evidence, not clear and convincing evidence); *Gullickson v. Brown, (In re Brown),* 108 F.3d 1290, 1293 (10th Cir. 1997). The Court must examine the evidence produced by SEPH as to each of the elements required for barring Terry's discharge under § 727(a)(2)(A).[6]

With regard to the Oklamiss Transfer, Terry's conduct met three of the four elements necessary to bar a discharge under § 727(a)(2): there was a transfer of property, in which the debtor held an interest, within one year of the petition date.[7] What the Court must determine, however, is whether Terry acted with the requisite intent to hinder, delay, or defraud creditors. Because a debtor will rarely admit to fraudulent intent, in seeking to determine fraudulent intent, courts employ the so-called "badges of fraud" test. The badges of fraud include:

> (1) a lack or inadequacy of consideration;

---

[6] After the Trustee and SEPH raised the issue of the Oklamiss and NOG Transfers as constituting fraudulent transfers under § 548, the Debtors "unwound" those series of transactions by reconveying all property transferred to NOG back to Raven Resources. That the Debtors may have taken action, in effect, to negate the transfers is without effect on the claims of SEPH that such transfers form the basis of an objection to discharge. Mere disclosure of a fraudulent bankruptcy transfer of property is not a defense to § 727(a)(2)(A) claim. Some courts have held that a debtor's discharge may be granted only if "he reveals the transfers to his creditors, [and] recovers substantially all of the property *before* he files his bankruptcy petition...." *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1345 (9th Cir. 1986) (emphasis added). Other courts hold the discharge may be denied under § 727(a)(2)(A) even if the debtor recovers fraudulently transferred property prior to filing for bankruptcy. *See, e.g.*, *Davis v. Davis (In re Davis),* 911 F.2d 560, 562 (11th Cir. 1990). Under either approach, the Debtors' attempt to "undo" the transfers is irrelevant.

[7] The Oklamiss Transfer was affected by a document executed on October 31, 2011, effective January 1, 2012. Either date was more than one year preceding the filing of the debtor's involuntary bankruptcy on September 30, 2014. However the Court has previously ruled that "under the 'continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year." *See* Doc 200, *Summary Judgment Order*.

14

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;

(6) the general chronology of events and transactions under inquiry;

(7) whether the transfer was disclosed or concealed;

(8) whether the debtor made the transfer before or after being threatened with suit by creditors (a variant of factor (5));

(9) whether the transfer involved substantially all of the debtor's assets;

(10) whether the debtor absconded; and

(11) whether the debtor was or became solvent at the time of the transfer.

*In re Wreyford*, 505 B.R. 47, 58-59 (Bankr. D. N.M. 2014) (citing *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008)); *Annino, Draper & Moore, P.C. v. Lang (In re Lang),* 246 B.R. 463, 469 (Bankr. D. Mass. 2000); *Frierdich v. Mottaz*, 294 F.3d 864, 870 (7th Cir. 2002). "Whatever badges of fraud a court uses, no particular badge is necessary, nor is any combination sufficient. The matter is always factual...." 5 *Collier on Bankruptcy*, ¶ 548.04[1][b][ii] (Henry Sommer & Alan Resnick (16th Ed. 2012)).

Applying these "badges of fraud," together with all other evidence in the case, the

15

Court has previously found that David possessed the requisite fraudulent intent to be denied a discharge under § 727(a)(2)(A). In David's case, the evidence was clear that it was he who managed the operations of Oklamiss and its subsidiary, Raven Resources, and was responsible for the decision for the Oklamiss Transfer. On the other hand, the evidence was that Terry was not involved in any decisions relating to the conduct of the oil and gas business. Another reason supporting a finding of fraudulent intent on the part of David was that the Oklamiss Transfer was not an isolated transaction but one of several similar transactions putting his assets beyond the reach of creditors, including the creation of the Red Britt Trust, the NOG Transfer and the non-disclosure of the recovery of the Neverve and Shimmerring Sands' BP Claims.[8] There was no that evidence that Terry had participated in any of those transactions.

There was some evidence that could weigh in favor of denying Terry a discharge under § 727(a)(2)(A). It is not disputed that Terry signed the October 31, 2011, Oklamiss Transfer agreement by which David and Terry transferred 98% of their 100% interest in Oklamiss to their children and signed the related profit or loss tax allocation agreement dated July 24, 2014.[9] The Oklamiss Transfer agreement was signed only two months after she and David had signed two "Consent and Agreement of Guarantors" acknowledging

---

[8] Terry testified that she was aware that a trust had been created by David and that it involved their daughter, and David's mother. But Terry did not know who the settlor, the trustee or the beneficiaries were. [Tr. pgs. 184-186]. She testified that prior to the trial she had never even read the Trust.

[9] There were two "tax allocation" agreements with regard to the Oklamiss Transfer. The first was a hand written agreement which was signed by David Stewart and the two Stewart children, Thad and Jena and dated October 13, 2013. Terry did not sign the handwritten agreement. The second agreement was type-written and bears Terry's signature dated July 24, 2014. Terry testified that she did not read the agreement before she signed it.

16

their approximately $19 million debt to SEPH's predecessor bank. The evidence was also that for several years Terry received a $100,000 salary from Raven Resources (owned by Oklamiss), and that Raven or Oklamiss paid the Debtors' personal household expenses. Terry also testified she was aware that Oklamiss and Raven Resources represented the great bulk of their wealth.

On the other hand, she testified that she did not recall the reason she signed the two Oklamiss documents other than being asked to do so by David who was the sole manager of Oklamiss.[10] Terry testified that she did not participate in or have any knowledge of any of David's oil and gas business operations, including those of Oklamiss or Raven Resources, until 2015, after the filing of this involuntary bankruptcy. While she was paid a salary prior to 2014 or 2015, she did not perform any tasks within the business other than being a "go-fer" when "someone from the office would call and ask me to go get something." Even after the bankruptcy, the only thing Terry did with regard to the business was to go to the office a few days a week and enter billing information on the computer. Of the hundreds of emails which were evidence in this case involving Stewart affiliates Oklamiss, Raven Resources, Neverve LLC or NOG, LLC, including the BP Claims, not one was sent to, sent by, or even copied to Terry.

As stated in its *Summary Judgment Order*, the Court's ability to listen to David's testimony, observe his demeanor and assess his credibility over five full days of testimony

---

[10] SEPH attempted to use David's deposition testimony in 2013 litigation unrelated to SEPH or this bankruptcy to establish that Terry was also a manager of Oklamiss. She was not. At trial, Terry testified that she had been a member, but not a manager. [Tr. pgs. 21, 302-303]. Even SEPH's expert witness, David Payne, testified that David Stewart was the sole manager of Oklamiss. [Tr. pgs. 400-401].

comprising nearly a thousand pages of transcript (and seven years of litigation) provided ample support for the Court to determine that *he* acted with fraudulent intent with regard to the Oklamiss Transfer, the creation of the Red Britt Trust and the NOG Transfer. On the other hand, after more than a day of Terry's testimony, which the Court found to be highly credible, the Court finds that she had little or no knowledge of her husband's business transactions and, in particular, little or no knowledge of any possible nefarious reason for her husband's preparation of the Oklamiss Transfer documents. Having heard Terry's testimony and observed her demeanor, the Court is left with the distinct impression that she acted without the requisite fraudulent intent necessary to sustain SEPH's § 727(a)(2)(A) claim relative to the Oklamiss Transfer.

SEPH asserts that even if Terry's execution of the two Oklamiss documents was not done with *actual* fraudulent intent it evidenced such a reckless indifference to the truth or condoning of her husband's conduct so as to meet the fraudulent intent requirement under § 727(a)(2). In cases which require a finding of fraudulent intent, the Court must consider the maxims that (1) exceptions to discharge are narrowly construed with all doubts resolved in the Defendant's favor, and (2) the fraud of one spouse is not imputable to the wife based on the marital relationship alone. *In re Butler,* 377 B.R. 895, 926 (Bankr. D. Utah 2006) ("[W]hether under § 727(a)(2) or (a)(4)(A), the intent to defraud requisite under 11 U.S.C. § 727 must be shown for each debtor.... [T]*he Code does not allow attribution of intent from spouse to spouse.*" (emphasis added); *In re Tsurukawa,* 258 B.R. 192 (9th Cir. BAP 2001). It is undoubtedly true that best practice requires that a person signing any document should fully understand its nature and impact. In the real world, that is not

18

always the case. Terry signed the two Oklamiss Transfer documents at her husband's request and in reliance on his business judgment, but the Court finds the evidence, when considered with Terry's credibility, insufficiently "reckless" to suffice in establishing the requisite fraudulent intent under § 727(a)(2).

SEPH presented as an expert witness David Payne ("Payne"), the head of a certified public accounting firm that provides restructuring and insolvency advisory services, appraisal services, and forensic accounting services. No doubt Payne is a qualified expert in those fields and has on previous occasions so testified before this Court. His testimony, however, added little to assist the Court in evaluating Terry's potentially non-dischargeable conduct. He testified as to the so-called "badges of fraud" which are traditionally applied to determine fraudulent conduct of barring a discharge under § 727(a)(2). The Court is quite familiar with the "badges of fraud" and had applied them in determining in its *Summary Judgment Order* that David was barred from receiving a discharge for violating § 727(a)(2). [Doc. 200, pgs. 31-32]. Both in his Expert Report and his testimony, Payne referenced David's deposition and trial testimony supportive of Payne's conclusions of an intent to defraud. The thirty-seven "End Notes" of his Expert Report reflect the documents and testimony which Payne reviewed in reaching his conclusions, including testimony from David Stewart, Ruth Carroll (David's mother), Linda McGuire (Raven Resources In-House Counsel), and Jena Rush (David's daughter) as well as exhibits from the depositions of Dan Neale (the accounting and IT manager for Raven Resources) and Dennis Lakely (David's and Raven Resources' tax accountant). Payne testified that in the preparation of his Expert Report and his trial testimony that he had not reviewed or relied upon any testimony of Terry. It was clear to the Court that Terry wasn't aware of any potentially

19

fraudulent conduct of David. She was also not aware of the information contained in the tax returns and/or/financial statements that Payne used to support his conclusions of debtor misconduct.

Unlike the Oklamiss Transfer, there was no evidence presented at trial, nor in the lengthy stipulated facts above, that Terry had any involvement with the transfers of property associated with either the creation of the Red Britt Trust or the NOG Transfer.[11] Terry's testimony that she had never read, or even seen, the Red Britt Trust and didn't know that she was a contingent beneficiary under it was unrefuted – "I knew I had something to do with it, but I didn't know exactly what that was."

### D. False Oath Under § 727(a)(4)(A).

Under Count III of its *Second Amended Complaint*, SEPH asserted that Debtors (for purpose of this trial, Terry) knowingly and fraudulently made false oaths or account in disclosing assets and transactions in her Schedules, Amended Schedules, Statement of Financial Affairs and Amended Statement of Financial Affairs ("SOFA") so as to deny her a discharge under § 727(a)(4)(A).[12]  In response, Terry asserted that any omissions or inaccuracies as to her assets as stated in her Schedules and/or SOFA's were not

---

[11] On direct examination of its expert witness relative to the transfer of assets and the badges of fraud,  SEPH's counsel noted that  "we are not raising any issues related to the Red Britt Trust...." [Tr. pg. 371].

[12] In its *Second Amended Complaint*, SEPH also asserted that David Stewart's testimony in trial and deposition relating to the receipt and use of the BP Claims Settlement Proceeds was false and thus actionable under § 727(a)(2).  No such claim was asserted against Terry. There is no question in the Court's mind that David Stewart's testimony was, to put it mildly, highly problematic. However, the Court has previously held that SEPH's § 727(a)(4) claim based upon allegedly false testimony relating to BP matters was barred for not having been timely brought. [See *Order Granting in Part and Denying in Part Defendant's Motion to Dismiss or Strike Certain Allegations and Claims As Untimely*; Doc. 198].

accompanied by the requisite proof of an actual fraudulent intent or reckless indifference to the truth.

Notwithstanding the presumption in favor of a "fresh start," a debtor who seeks the protection afforded under the Bankruptcy Code has a duty to fully disclose the nature of his assets and financial affairs when completing his statements and schedules. *Butler*, 377 B.R. at 914-15 ("In exchange for that 'fresh start,' the Code requires debtors to accurately and truthfully present themselves before the court."); *Wieland v. Gordon (In re Gordon)*, 526 B.R. 376, 387 (10th Cir. BAP 2015) ("[T]o be entitled to discharge, the debtor must deal fairly with creditors and with the Court."); *The Cadle Co. v. King (In re King),* 272 B.R. 281, 300 (Bankr. N.D. Okla. 2002) ("The bankruptcy schedules and statement of affairs do not ask the debtor to make an assessment of what *he* thinks are important assets or debts. Debtor[s] must, under oath, list *all* creditors and assets, as well as all transfers of property within the prior year."(emphasis in the original).

A debtor's discharge may be denied if the debtor knowingly and fraudulently, in connection with the case, makes a false oath. 11 U.S.C. § 727(a)(4)(A). "A 'false oath' may be either: (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings." *In re Garland*, 417 B.R. 805, 814 (10th Cir. BAP 2009).

"The existence of false or inaccurate statements is not, in and of itself, sufficient cause to deny a debtor's discharge unless it is shown that these were knowingly and fraudulently made." *Robin Singh Educational Services, Inc. v. McCarthy (In re McCarthy),* 488 B.R. 814, 826 (1st Cir. BAP 2013). "To prevail on a claim for denial of discharge under

21

§ 727(a)(4)(A), the plaintiff must establish the following elements by a preponderance of the evidence: (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement was false; (4) that the debtor made the statement with intent to defraud; and (5) that the statement related materially to the debtor's bankruptcy case." *In re Splawn*, 376 B.R. 747, 759-60 (Bankr. D. N.M. 2007) (citing *In re Eigsti*, 323 B.R. 778, 783-84 (Bankr. M.D. Fla. 2005)). The subject matter of a false oath is material and warrants a denial of discharge if it is related to the debtor's business transactions, or if it concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property. *See, e.g.*, *In re Calder*, 907 F.2d 953, 955 (10th Cir. 1990).

The burden of proof rests with the party opposing discharge, but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987). The Debtor will not be denied a discharge if a false statement is due to mere mistake or inadvertence. *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) (citing *In re Butler*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984)). Moreover, an honest error or mere inaccuracy is not a proper basis for denial of discharge. *Id.* at 1295; *In re Magnuson*, 113 B.R. 555, 558-59 (Bankr. D. N.D. 1989). "However, 'reckless indifference to the truth...has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *In re Webb*, 2019 WL 2895000, at *7 (Bankr. N.D. Okla. 2019) (citing *In re Tully,* 818 F.2d 106, 112 (1st Cir. 1987)); *In re Croft*, 500 B.R. 823, 858 (Bankr. W.D. Tex. 2013). Reckless disregard means, "not caring

whether some representation is true or false." *In re Webb,* 2019 WL 2895000, at *7 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)); *In re Wagner*, 527 B.R. 416, 430 (10th Cir. BAP 2015). The sheer volume of misstatements or omissions in a debtor's sworn bankruptcy filings may preclude a finding of excusable inadvertence and instead establish "the type of extreme carelessness or reckless indifference that equates to fraud and a bar to discharge." *Harrington v. Donahue (In re Donahue),* 2011 WL 6737074, at *13 (1st Cir. BAP 2011) (citation and internal quotation mark omitted); *see also ABCD Holdings, LLC v. Hannon (In re Hannon),* 512 B.R. 1, 17 (Bankr. D. Mass. 2014) ("the volume and repeated nature of the Debtor's omissions" made reckless indifference "the only plausible conclusion").

The "mistake" or "I didn't think it was important" defenses have their limits. "A debtor has an uncompromising duty to disclose *whatever* ownership interests are held in property," and "[i]t is not for the debtor to pick and choose or obfuscate the answers." *Fokkena v. Tripp, (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) (emphasis in the original); *Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) ("Debtors have an absolute duty to report whatever interest they hold in property, even if they believe the assets are worthless or are unavailable to the bankruptcy estate."); *Morrel, West & Saffa, Inc. v. Riley (In re Riley),* 128 B.R. 567, 569 (Bankr. N.D. Okla. 1991) ("The Debtor cannot omit information required of him simply because he believes or decides the property omitted has no value or the information is not necessary. This is for the creditors and the Court to decide."). Moreover, that duty of disclosure continues beyond the initial filings in the case so that "[f]ailure to amend schedules after becoming aware of their inaccuracies is

23

additional indicia of a debtor's reckless indifference to the truth." *Grassmann v. Brown (In re Brown)*, 570 B.R. 98, 116 (Bankr. W.D. Okla. 2017).  The cumulative effect of a large number of falsehoods in the debtor's schedules is evidence of reckless disregard for the truth, and is sufficient to circumstantially prove fraudulent intent under § 727(a)(4)(A). *In re Crumley*, 428 B.R. 349, 366-67 (Bankr. N.D. Tex. 2010).

### 1. The Jewelry

Most, though not all, of SEPH's § 727(a)(4)(A) claim focused upon the disclosure and valuation of Terry's jewelry. SEPH argues that Terry knowingly and fraudulently undervalued her jewelry by listing its total value at $7,012 when she surely must have known that the jewelry had a value much greater. There is no doubt that there are differences in the valuations of their jewelry in the Debtors' original Schedules and the Amended Schedules and a huge difference between those valuations and the valuation of SEPH's expert witness. Debtors' original Schedules showed that they owned a combined total of $5,500 in jewelry. Terry testified that the original Schedules in which the jewelry was listed as having a value of $5,000 were prepared in a "rush" with her attorneys in Alabama shortly after the order for relief had been entered in the involuntary case (after Alabama counsel had successfully moved to transfer the case to Oklahoma) and in collaboration with David's in-house attorney, Linda McGuire. After the bankruptcy had been removed to Oklahoma, the Debtors' new Oklahoma counsel, Ruston Welch, believed that amendments to the Schedules were in order and instructed the Debtors to obtain appraisals of the jewelry. After first going to a pawnshop to have the jewelry "appraised or valued," Debtors were referred to Kannard Jewelers, ("Kannard") to obtain a "value."

24

In Debtors' Amended Schedules, filed on September 29, 2015, after SEPH had issued a subpoena to jeweler B.C. Clark, Terry disclosed that she owned $7,012 in jewelry. This valuation was performed by Kannard. SEPH points out that some of the same items valued by Kannard, David had purchased from B.C. Clark Jewelers, including: a $449 appraised value on a tanzanite ring purchased for $7,475; a value of $176 on earrings purchased for $2,400; a $7 value on a bracelet purchased for $265; a $150 value on a cross and chain purchased for $2,300; and a $900 value on diamond earrings purchased for $6,250.[13] Terry testified that David had purchased all the jewelry, and "that he had not told her what he had paid for it." Terry testified that all of the jewelry that she owned was disclosed, but that certain items on the B.C. Clark sale records were purchased for other people, including a diamond engagement ring for Terry's now daughter-in-law and "Jelly Beans Quartz Strips, Michele Watches" for her daughter.

Terry testified that she believed that the $7,012 valuation of the jewelry in the Amended Schedules was the price at which she could sell the jewelry to Kannard who had valued it. It was her understanding that David had been advised to obtain "the value that Kannard gave us as if they bought the jewelry today - is not the same value, I'm assuming, that we purchased them for, but I don't know what David paid for any of this." As the Court views it, the determination of whether Terry possessed the requisite fraudulent intent rests upon whether she justifiably relied on the Kannard valuations when she signed the

---

[13] In its closing argument, SEPH points out that "Mr. Kannard's offer to purchase was dramatically different than the purchase price of the jewelry." [Doc. 254, pg. 9 n. 6]. A comparison of the original purchase price of jewelry and the price at which it can now be sold it is not very helpful. "As many a bankruptcy trustee has learned, there is often a surprising spread between the price at which jewelry was purchased and the price at which it can be sold." *Glaser v. Chelec, Inc. (In re Glaser),* 2002 WL 32375007, at *5 (Bankr. E.D. Va. 2002).

25

Amended Schedules.

SEPH introduced the testimony and an appraisal of the jewelry by an expert, J. Miles Dowd. By an appraisal conducted on June 24, 2021, almost six years after the filing of Terry's Amended Schedules, Dowd placed a fair market value of $130,246 for some twenty-seven (27) items of jewelry of both David and Terry (the "Dowd Report").[14] In his trial

---

[14] The Dowd Report was listed as SEPH's proposed Exhibit 110; however, that exhibit was never offered into evidence at trial. Mr. Dowd's deposition, taken just three days before the commencement of trial, was not available at the time of the trial. The deposition was later admitted with the Dowd Report as an exhibit to the deposition. Terry objected to the Dowd Report as part of the deposition by filing her post-trial *Motion in Limine or to Strike or Exclude Testimony and Expert Report*. [Doc. 238]. The court overruled Terry's motion. [Doc. 258]. The Dowd Report was therefore admitted into evidence as part of Dowd's deposition.

Both of Terry's pre-trial and post-trial *Motions in Limine* sought to exclude the Dowd Report on the basis, *inter alia,* that the appraisal was made too far removed in time from the Petition Date to be admissible. The Court denied both motions on essentially the same basis, finding that the time differential between the filing of bankruptcy and the date of the appraisal of the jewelry went to the weight to be accorded the testimony and Report, not its admissibility. [Docs. 201 and 258].

Ironically, in this case in which SEPH sought to bar Terry's discharge on the basis of filing false schedules, SEPH's jewelry expert, Dowd, admitted in his testimony that in September 2013 in his personal bankruptcy he had agreed to waive his discharge after the United States Trustee had filed an adversary Complaint for Dowd having filed false schedules. [*In re James Miles Dowd et. al*, Case No. 13-30852-BJH, (Bankr. N. D. Texas)]. He also admitted having plead guilty in 2016 to bankruptcy fraud in violation of 18 U.S.C. § 152(3) (False Statement Under Penalty of Perjury). [*United States of America v. James Miles Dowd,* Case No. 3-15 CR-435-L, (N. D. Tex.)]. SEPH objected to Terry's counsel questioning Dowd about his bankruptcy and related criminal conviction on the basis of relevancy and that the conviction was older than 10 years. [Dowd Depo. Ex. 55., pg.137-138].

Fed. R. Evid. 609(a)(2) governing the admissibility of prior convictions applies here. The Advisory Committee's Note to that section provides:

> The admission of prior convictions involving dishonesty and false statement is not within the discretion of the court. Such convictions are peculiarly probative of credibility and, under this rule, are always to be admitted. Thus, judicial discretion granted with respect to the admissibility of other prior convictions is not applicable to those involving dishonesty or false statement.

Furthermore, the "10-year rule" under Rule 609(b) does not apply here since Dowd's judgment of conviction was entered on April 4, 2016, and his testimony was by deposition taken on July 15,

deposition Dowd adjusted that valuation downward as of the date of the bankruptcy in 2015 to be $89,250. SEPH asserts that the difference in value between the Kannard valuations and the purchase price as well as the huge difference between the scheduled values and the Dowd Report are proof that the Schedules carry the requisite fraudulent intent. The Court disagrees. If this were solely a question as to whether the Dowd Report or the Debtors' Schedules most accurately represented the value of the jewelry in 2015 the Court might well find in favor of the Dowd Report; however, the issue before the Court is not whose valuation is more accurate. The Court need not make a determination of the jewelry's value in order to adjudicate SEPH's § 727(a)(4)(A) claim. The question is whether Terry's valuation based on the estimate of Kannard was made in bad faith or with fraudulent intent. A debtor's bad faith, or fraudulent intent, is generally determined by examining the relevant surrounding circumstances.

On similar facts, the bankruptcy court in *Harker v. West (In re West),* 328 B.R. 736 (Bankr. S.D. Ohio 2004), rejected similar arguments made by a Chapter 7 trustee in a § 727 action. There, the trustee argued that the debtor must have known that her items of jewelry originally purchased for more than $30,000 had a value much greater than the $2,000 "pawnshop" value she put on her schedules. *Id*. at 750. The trustee also argued that the debtor's $2,000 valuation was so far off the mark that it had to be a knowing and

2023; accordingly, the Court finds that Dowd's conviction must be admitted. However, the Court finds that, while admitted, the conviction should not be given any probative value as (1) Dowd's jewelry appraisal does not involve his honesty and credibility and (2) the Court has already found that Terry's lack of fraudulent intent is governed by the reasonableness of her reliance upon the Kannard valuations and not by the difference between the Kannard and Dowd valuations.

27

fraudulent misrepresentation under § 727. *Id*. In response, the debtor asserted that she simply followed her counsel's instructions to list her jewelry at its pawnshop value. *Id.* The *West* court found the debtor's testimony credible even though her counsel's advice appeared to be based on a misunderstanding of the appropriate standard for valuing property listed in a debtor's schedules. The court reasoned:

> While the case law is sparse on the subject, the majority, and better-reasoned, line of authority holds that personal property should be listed in the debtor's schedules at fair-market, rather than liquidation, or distressed-sale, value. But while [the debtor] may have been advised by her bankruptcy counsel to utilize a valuation standard that has not gained acceptance, the Court is not persuaded that she acted in bad faith by relying on his instruction to list her jewelry at its pawnshop, or liquidation, value.

*Id*. at 750-5. *See also, In re Valentine,* 2009 WL 3336081, at *7 (Bankr. D. N.H. 2009) (the Court finding "the Debtor's testimony credible and that she did not act in bad faith by relying on her counsel's advice to schedule her jewelry only using a liquidation value rather than fair market value. The question here is not which valuation method is correct but whether the debtor had any reasonable basis for choosing the one that she did.").

Although a large majority of courts have concluded the property should be listed in a debtor's schedules at its fair market value, there is at least limited support that the liquidation-value approach Terry understood from David, via advice from counsel, was appropriate. *See West*, 328 B.R. at 750 n.8 (citing cases and explaining majority and minority approaches). Terry could not reasonably have been expected to know that she was required to use fair market value, rather than liquidation value, in completing her schedules with respect to the jewelry where the advice had some limited support and it was

28

not "transparently plain" that the advice was improper. *See*, *e.g. In re Kelly*, 135 B.R. 459, 462 (Bankr. S.D. N.Y. 1992) ("The defense of reliance on counsel is not available when it is transparently plain that the advice is improper."). Having weighed the evidence, the Court concludes that Terry's undervaluation of the jewelry in her schedules does not constitute a knowing and fraudulent misrepresentation within the meaning of § 727(a)(4)(A).

In addition to the valuation issues with regard to the jewelry, there was also the issue of the *omission* from the Schedules of a few pieces of jewelry, including an 18 carat white gold and diamond bridal ring, which SEPH's expert valued at $40,351, which Terry testified she had given to her daughter, Jena, as a wedding present in 2012; an 18 karat white gold and diamond necklace by Roberto Coin, which SEPH's expert appraised at $11,349, and gifted to Jena; a 14 karat yellow gold and diamond "straight-line" (tennis) bracelet gifted to Jena that SEPH's expert valued at $7,909; and a pair of 18 karat white gold, Tanzanite and diamond earrings valued at $5,612, which she had gifted to her daughter-in-law. All of these items were furnished to SEPH's expert for appraisal but not included in the Amended Schedules or Kannard's valuation.

Terry testified both in her 2004 and at trial that these items of jewelry were not included in the Schedules nor in the Kannard valuation because they had been gifted away prior to bankruptcy and were no longer her property. She was not in possession of those items at the time of the filing of the involuntary bankruptcy, but was later advised by Raven Resources in-house counsel, and later by bankruptcy counsel, Ruston Welch, to have those items returned to her, presumably in anticipation of a bankruptcy court challenge to

29

the jewelry's transfer to family members.[15] While Terry had retaken possession of the jewelry upon advice of counsel, there was no evidence contradicting her testimony that she had prior to bankruptcy gifted those items to her daughter and/or daughter-in-law.[16] Bankruptcy schedules do not require the disclosure of the transfer or gifts of assets to family members made more than one year prior to the bankruptcy filing. Under the circumstances, the Court finds that exclusion of such jewelry from both the Kannard valuations and the Schedules was not indicative of fraudulent intent.

SEPH asserts that the original Schedules and Terry's testimony at the 341 examination were so incomplete as related to the jewelry so as to constitute the necessary § 727(a)(4) fraudulent intent. Federal Rule of Bankruptcy Procedure 1009(a) permits a debtor to amend her schedules "as a matter of course at any time before the case is closed." Nevertheless, bankruptcy courts are "entitled to insist upon filings and representations made in the utmost good faith." *In re Hannigan*, 409 F.3d 480, 483 (1st Cir. 2005). As a result, debtors cannot turn their property schedules into a game of "hide and seek" where the debtor "quietly retains all property that the trustee does not find and then moves to amend the schedules when the trustee becomes aware of the property." *In re*

---

[15] No such challenge to Terry's gifting of her jewelry to her daughter or daughter-in-law was ever made, and the time to make such a challenge has long expired.

[16] As Terry testified at trial, "Well, we gave Jena the one--my--my 25th anniversary ring after she got married, and at some point in time I was advised that we needed to put that back in our possession. It's still hers, but I have it." [Tr. Pg. 235].

The diamond ring which Terry testified that she had given her daughter as a wedding present in 2012 appeared on the Debtors' homeowners insurance policy endorsement as having a value of $36,600. Terry testified that she had no knowledge of obtaining the insurance policy and why the ring was included; however, the policy period was from August 17, 2015, to August 10, 2016, after possession of the ring was recovered by Terry from her daughter upon advice of counsel.

*Edmonds,* 27 B.R. 468, 469 (Bankr. M.D. Tenn. 1983). Was this a situation where Terry amended her schedules only after she "got caught with her hands in the cookie jar" when SEPH served a subpoena on B.C. Clark Jewelers documenting the purchases which David had made going back to 2005? After considering the totality of the circumstances giving rise to the Amended Schedules, the Court finds that this was not such a situation.

This bankruptcy case was (and is) unique. It was filed on September 30, 2014, as two separate involuntary cases by SEPH in the Bankruptcy Court for the Southern District of Alabama. The Debtors were represented by Alabama attorneys. On April 3, 2015, Debtors filed their *Motion to Transfer Venue* seeking removal of the case to the Bankruptcy Court for the Western District of Oklahoma. While the *Motion to Transfer Venue* was pending, Debtors obtained orders from the court extending the date within which they were required to file Schedules or Provide Required Information by April 30, 2015.  One day late, on May 1, 2015, Terry, through her Alabama counsel (who had already successfully sought to transfer the case to Oklahoma) filed her original Schedules. As Terry testified at trial, with Alabama counsel, "everything was rushed (and) we were in a really big hurry to evaluate everything... (but) when the case was moved to Oklahoma, Rusty Welch took it and he was much more tedious and detailed to the point where he came to the home and took pictures of everything." The preparation of the Schedules by Alabama counsel and by Mr. Welch was the difference "between night and day."  After Terry testified at the 341 examination, Oklahoma counsel Welch reviewed and discussed the Schedules, identified corrections that needed to be made and discussed with the Trustee needed amendments. The evidence is that the Debtors provided the Trustee with not only pictures of the jewelry but pictures of the rooms and contents of the house. The Trustee later testified that he

found the Debtors' degree of candor with respect to the schedules to be "extraordinary."

For the foregoing reasons, the Court concludes that SEPH's objection to the discharge of Terry pursuant to § 727(a)(4) is denied.

**E. Unexplained Decrease in Assets -- § 727(a)(5) Claim.**

Count IV of SEPH's *Second Amended Complaint* seeks to bar Terry's discharge under the provisions of § 727(a)(5). Section 727(a)(5) states that the debtor will be denied a discharge when "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." "The purpose underlying Section 727(a)(5) is to ensure that, prior to being granted a discharge, the debtor provides a full and accurate picture of his financial transactions and activities prior to bankruptcy, thereby preventing the burden of discovering, locating, and recovering assets from being shifted to the trustee and creditors." *In re Brown*, 570 B.R. 98, 118 (Bankr. W.D. Okla. 2017) (citing *Crane v. Morris (In re Morris)*, 302 B.R. 728, 742-43 (Bankr. N.D. Okla. 2003)). "A *prima facie* case under § 727(a)(5) exists where a creditor shows that there was an unusual and unexplained disappearance of assets shortly before the debtor filed bankruptcy." *Brown*, 570 B.R. at 118 (citing *In re Carlson*, 2008 WL 8677441, at *5 (10th Cir. 2008)).

After the objecting party demonstrates a disappearance of assets, § 727(a)(5) requires the debtor to come forward with "a satisfactory explanation which must consist of more than vague, indefinite and uncorroborated assertions by the debtor." *Carlson,* 2008 WL 8677441, at *5 (quoting *Damon v. Chadwick (In re Chadwick)*, 335 B.R. 694, 703 (W.D. Wis. 2005)). In other words, a debtor's explanation regarding loss of assets should

satisfy two concerns: It "must be supported by at least some corroboration," and that corroboration "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets." *In re Simmons,* 810 F.3d 852, 860 (1st Cir. 2016) (quoting *Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803, 817 (1st Cir. BAP 2005)).

Courts have generally determined that what constitutes a satisfactory explanation under § 727(a)(5) is left to the sound discretion of the court. *See Martinez v. Sears (In re Sears),* 565 B.R. 184, 192 (10th Cir. BAP 2017) (citing *Blackwell Oil Co. v. Potts (In re Potts),* 501 B.R. 711, 726 (Bankr. D. Colo. 2013) (and cases cited therein)). But, a determination as to whether an explanation is satisfactory does not take into account whether what happened to the assets was improper. *Carlson,* 2008 WL 8677441, at *5 (quoting *Shappell's Inc. v. Perry (In re Perry),* 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000)). "That is because it is not necessary for a creditor to demonstrate a fraudulent intent on the debtor's part for purposes of denying a discharge under Section 727(a)(5)." *Brown,* 570 B.R. at 118 (citing *Carlson,* 2008 WL 8677441, at *5); *In re McDonald*, 614 B.R. 801, 812 (Bankr. N.D. Ohio 2020); *In re Beatty*, 583 B.R. 128, 140 (Bankr. N.D. Ohio 2018) ("a plaintiff need not demonstrate wrongful intent on the part of the debtor in order to prevail on a § 727(a)(5) claim"); *Baker v. Reed (In re Reed),* 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004) (§ 727(a)(5) "simply imposes strict liability" where the plaintiff meets his burden and the debtor does not provide an adequate explanation).

In the present case the undisputed facts indicated that in the years leading up to bankruptcy the Debtors suffered massive amounts of unexplained loss of asset values: in a May 31, 2010 personal financial statement, the Debtors reported a net worth of

33

$26,277,010; a May 19, 2011 personal financial statement reported a net worth of $19,358,491; a December 31, 2012 personal financial statement reported a net worth of $7,677,138; and a December 31, 2013 personal financial statement they reported a net worth of $312,646. Undoubtedly, a large portion of the diminution in Debtors' net worth between 2012 and 2013 was attributable to the Oklamiss Transfer which took the Oklamiss ownership of Raven Resources off the Debtors' financial statements.[17]

Other than acknowledging that the interest in Oklamiss and Raven Resources were the Debtors' most valuable asset, Terry had no knowledge of, and thus was unable to explain, the reasons for the Debtors' loss of asset value. In the Court's opinion, Terry's testimony that she had no knowledge of or managerial involvement with her husband's oil and gas activities was credible. The rationale for § 727(a)(5) is that the debtor is in control of the assets and is in the best position to know what happened to those assets. *Wilmington Trust Co. v. Jarrell (Matter of Jarrell)*, 129 B.R. 29, 34 (Bankr. D. Del. 1991). Here, Terry did not have control or knowledge her husband's business assets.

Where a creditor has objected to the discharge of joint debtors for failure to explain loss of assets, courts have refused to deny a discharge to the spouse who did not own, control, and/or dissipate the assets. *See Prairie Production Credit Association v. Suttles (In re Suttles)*, 819 F.2d 764, 766 (7th Cir.1987) (affirming bankruptcy court's determination that debtor-husband's discharge would be denied but that debtor wife's failure to explain loss of assets resulted from honest mistake and her discharge would not be denied);

---

[17] As the Court stated in its *Summary Judgment Order*, "From the evidence the Court has heard over the last 7 years, decreases in net worth are largely attributable to losses in the value of the Debtor's interest in Oklamiss and Raven Resources and perhaps other entities." [Doc. 200, pg. 49].

34

*Shaheen v. MacPherson (In re MacPherson),* 101 B.R. 324, 326 (Bankr. M.D. Fla.1989) (denying debtor husband's discharge but overruling objection to debtor wife's discharge because no evidence proved she actively participated in the disposition of missing funds although she may have technically had ownership of them), *aff'd,* 129 B.R. 259 (M.D. Fla.1991); *Manhattan Leasing Systems v. Goblick (In re* Goblick), 93 B.R. 771, 776 (Bankr.M.D.Fla.1988) (refusing to deny debtor wife's discharge for failure to explain loss of assets where most of the missing assets were owned by debtor husband); *Bacon v. Hyers (Matter of Hyers)*, 70 B.R. 764, 769 (Bankr. M.D. Fla.1987) (dismissing objection to discharge of debtor wife where no evidence was adduced that she was involved in transaction between creditor and debtor husband that resulted in the missing assets).

There is scant evidence that Terry knew and was thus able to explain what happened to the loss in value of the Stewart affiliates. A considerable amount of SEPH's trial examination of Terry dealt with her and David's tax returns and financial statements.[18] Other than having signed the tax returns and a few of the financial statements which were prepared by David and his accountant, Terry testified that she had not read or had input or knowledge of the content of those documents. Simply put, Terry was in no manner engaged in the operation of David's oil and gas ventures and financial transactions. Not to be pejorative in any manner – the Court believes Terry's self-described role in the

---

[18] SEPH's forensic fraud and tax expert witness, David Payne, gave approximately 100 pages of testimony on matters such as "the badges of fraud" with which the Court is intimately familiar. His testimony principally focused on the tax returns of the Stewart's and the oil and gas affiliates operated by David Stewart. The Court did not find this testimony helpful as to the core issue of Terry's right to a discharge. The testimony was clear that she knew nothing about the operation of the affiliates and even less about the intricacies of the tax preparation about which her counsel and Mr. Payne sparred.

35

couple's relationship and in financial matters which put money into that relationship was as an essential and life-fulfilling "house wife." It is not even suspicious that Terry had no real knowledge of David's business affairs or transactions - that's just the way it is in many relationships, and the way it was in theirs. Her occasional trips to the office to run errands did not give her insight into the business operations or finances, and certainly were not sufficient for her to know the basis of any asset fluctuations. Terry's reliance on her husband was objectively reasonable under the totality of the circumstances presented here. The Court finds credible Terry's assertion that she did not have sufficient knowledge of David's oil and gas business affairs to be able to explain the loss of business assets.

### V. Conclusion

Recognizing the general rules that the right to a discharge is left to the sound discretion of the bankruptcy court; that exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's "fresh start" policy; that a total bar to discharge is an extreme step; and that § 727 is to be construed liberally in favor of the debtor, the Court finds that Plaintiff SEPH has not met its burden of proof under Bankruptcy Code §§ 727(a)(2),(4) and/or (5) to bar the discharge of Terry P. Stewart. Accordingly,

**IT IS ORDERED** that SEPH's request that the Chapter 7 discharge of Terry P. Stewart be denied, will be **DENIED**. Any scheduled debt owed by Terry P. Stewart is therefore extinguished, including any personal liability that she may have as a result of any judgment rendered in favor of Southeast Property Holdings, LLC.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, a separate judgment will be entered contemporaneously with the entry of this Opinion and Order.

**#   #   #**

36